[No. 5839. Decided October 16, 1905.]

THE STATE OF WASHINGTON, *on the Relation of Spokane Falls & Northern Railway Company, Plaintiff,* v. THE SUPERIOR COURT FOR SPOKANE COUNTY *et al., Defendants.*[1]

EMINENT DOMAIN—APPLICATION BY RAILWAY TO CONDEMN LANDS APPROPRIATED BY ANOTHER RAILWAY — NECESSITY — FINDINGS — EVIDENCE—SUFFICIENCY. No sufficient necessity is shown for a condemnation by one railroad of lands appropriated by another railroad for its city terminals, already restricted on one side by a river and on the other by another railroad, where it appears that the lands were hardly sufficient, and were absolutely required by the defendant company, that the petitioner's ostensible object of the condemnation was to reach certain business houses and manufacturing plants to which it already had means of access over the tracks of another railroad company, and also by other routes, and the only reason why it did not reach the point over several other available routes was the question of expense, and there was no attempt to show what such extra expense would be; since the necessity must be great to justify the right to appropriate the terminal grounds of another company.

SAME—DEFENDANT RAILWAY NOT IN OPERATION—ROAD BEING ESTABLISHED—LANDS PURCHASED FOR TERMINALS—PROTECTION OF RIGHTS. A railroad company not yet in operation will be protected from the appropriation of its terminal rights to the same degree as a road that is in operation, where it appears that it is constructing its road, and would be in operation in the near future, and had spent large sums in securing terminals; since it is necessary to secure terminal facilities before beginning operation.

[1]Reported in 82 Pac. 417.

Certiorari to review a judgment of the superior court for Spokane county, Huneke, J., entered September 5, 1905, upon findings in favor of the defendant, after a trial before the court without a jury, dismissing on the merits a petition to condemn a railway right of way across land appropriated by another railway for terminal purposes. Affirmed.

*M. J. Gordon* and *C. A. Murray,* for relator.

*Graves & Graves* and *Allen & Allen,* for defendants.

DUNBAR, J.—This is an application for a writ of certiorari to review the judgment of the superior court of Spokane county, dismissing the petition of the Spokane Falls & Northern Railway Company to condemn certain lands in the city of Spokane, which had been appropriated by the Spokane International Railway Company. The land sought to be appropriated was a strip thirty feet in width, a distance of about four blocks between Division street and Washington street. Without the filing of a map with this opinion, which is impracticable, it would be impossible to intelligently describe the situation to any one not acquainted with the city of Spokane, the names of its streets, and the location of its railroads and depots. The main questions to be determined, however, are the necessity on the part of the petitioner to use the ground sought to be condemned, and the effect of such use on the defendant; the question whether a corporation, having the power to condemn lands by our law of eminent domain, can appropriate the property of another corporation which had already been devoted to public purposes, having been determined by this court in favor of the right of such condemnation in the case of *Seattle & Col. R. Co. v. Bellingham Bay etc. R. Co.,* 29 Wash. 491, 69 Pac. 1107. In this case all technical questions have been waived by stipulation, and the cause is certified here for adjudication upon the merits.

The finding of the court is—and such finding is warranted by the testimony—that the petitioner was organized under

the laws of the state of Washington, in the year 1889, for
the purpose of building a railway from the city of Spokane
to the international boundary line; that thereafter it built
a line of railway between Spokane, in Spokane county, and
Northport, in Stevens county. Its Spokane terminus was
fixed at a point north of the Spokane river and south of
Mallon avenue, and immediately east of, and running up
to, Division street. The road thus built was operated for
some years, when the control of the road was acquired in
the interest of the Great Northern Railway Company, and
ever since the road has been practically controlled and man-
aged by the Great Northern, although maintaining an inde-
pendent legal existence, and having general officers, in the
main being the same as certain of the general officers of the
Great Northern. The testimony shows that several years
ago the track of the road between Colbert, some distance
north and east of Spokane, and the town of Hillyard, im-
mediately north of Spokane and adjoining the city limits,
was taken up. The track from Hillyard into its yards was
not used thereafter, except for storing cars and switching
and for a general service track. The passenger trains of
the road were operated over the line of the Great Northern
from said Colbert into the Great Northern depot at Spo-
kane; the freight trains were operated from Colbert to Hill-
yard over the line of the Great Northern, and were there
broken up and handled by the Great Northern to their desti-
nation within the city limits. The passenger depot of the
company near Division street was sold and removed; the
freight depot was rented for other purposes, and the terminal
grounds were entirely abandoned, except in so far as they
were used in connection with the track between Hillyard
and this point as aforesaid.

Prior to January 17, 1905, D. C. Corbin had in con-
templation the building of a line of railway between Spokane
and the international boundary line at a point in Kootenai
county, in the state of Idaho, and, with a view of obtaining

terminal grounds for passengers, freight, roundhouses, and other general purposes, in Spokane, he commenced purchasing property in said city in River Front and Pittwood's additions and in block 74 of Central addition. This property lies between the Spokane river on the south of it and the Oregon Railway & Navigation Company's tracks and the Union depot grounds on the north of it, and between Washington street on the west and Division street on the east, and is property which is embraced in the terminal grounds through which this condemnation is sought. On the 17th day of January, 1905, the defendant Spokane International Railway Company was organized under the laws of this state, and immediately after that its entire capital stock was subscribed, its board of trustees organized and its officers elected, and all things done necessary to entitle it to do the business for which it was organized. Immediately thereafter its board of trustees, by resolution, directed its engineer to locate its line in the city of Spokane. The following finding is made by the court:

"The ground thus selected for its depot and terminal grounds was necessary to said defendant for said purposes. The whole quantity of said ground so selected is needed by said defendant, and it is practically impossible for it to do with less. Indeed, it will have in all probability difficulty in accommodating all of its buildings and tracks within these tracts of land."

The court also found that the petitioner had been guilty of bad faith in its attempt to obtain a right of way through these terminal grounds; that it was in reality the Great Northern Railway Company; that the Great Northern Railway Company had a right of way south of the Spokane river immediately between Division street and Washington street, which would be a feasible way for the petitioner to reach the business which it sought to reach by the condemnation proceedings; that it could, also, with slight expense, reach the same point by traversing a route north of the Oregon Railway & Navigation Company's terminal grounds. The

ostensible object of the condemnation of this thirty-foot strip is to reach certain business houses and manufacturing plants west of Washington street and northwest of Havermale's Island, it being alleged and proven on the trial that something like one hundred cars a month, which were consigned to the petitioner's railroad, were sent out from these manufactories; that said cars had to be switched by the O. R. & N. Co., and that a charge of $3 a car was made for such service by the O. R. & N. Co., and that the shipper had to pay this extra expense. The land sought to be condemned, however, did not reach to these manufactories or plants, but only to an unused right of way of the Great Northern Railway Company, which led out in that direction, so that, in any event, the output of such factories would have to be handled by the Great Northern.

Although it is established in this jurisdiction that one railroad company has a right to condemn property of another, such right of condemnation cannot be claimed for slight reasons. It is evident that the operation of the cars of one company through the terminal grounds of another should be avoided if possible, and that such operations are liable to lead to difficulties, accidents, and trouble generally. If, however, the necessity is great, either on account of the prohibitive expense incident to the building of the road of the petitioning company in any other locality or by reason of engineering impossibilities, the condemnation will be permitted if the result is not seriously deleterious to the company whose lands are sought to be condemned. In this case it was testified by the engineers and by the manager of the Great Northern Railway Company, who seemed also to be the manager of the petitioning company, that the only reason why the petitioning company could not run the route north of the O. R. & N. Company's terminal grounds was a question of expense. But there was nothing definite testified to; no estimate had been made of these routes, no attempt, evidently, to determine what the extra expense, if any, would

be. In speaking of this proposition, Mr. Lewis, Eminent Domain, § 267b, says:

"It is manifest, however, that even a railroad company which is organized under a general law, may show a reasonable necessity for taking part of the right of way of another road, as when it is located through a town in which another road has been previously built and the topography or other conditions are such that the new road cannot reasonably be located so as to accommodate the public and accomplish the object in view without either encroaching on the right of way of another company or incurring ruinous or greatly increased expense. The same necessity may arise in mountainous countries, or else the first company might preclude all others from reaching certain localities. But this implied authority only extends to the taking of so much of the right of way of the first company as can be spared without material detriment. The question is, 'Whether the new condemnation can be made without destroying the use and usefulness of that part of the first-acquired right of way which is in actual use, or so obstructing or hindering or embarrassing it as to render it unsafe.' Just what the degree of necessity must be to justify the taking it is difficult to say. One company cannot take part of the right of way of another merely because it is more convenient. It is largely a question of practicability and expense, of comparative advantage and injury, having regard always to the interests of the public, for whose benefit the general authority is given, and the particular taking proposed. If no reasonable or sufficient necessity is shown the taking must be denied under the general rule."

And the same rule prevails in relation to taking the lands used for depots, yards, shops, and other appurtenances. It was shown by the testimony of the petitioner that the same point could be reached by building on the south side of the Spokane river, the distance being practically the same, the only extra expense being the building of two bridges. There was no testimony on the part of the petitioner as to what the cost of these bridges would be, there having been no estimates made, the principal contention on the part of the petitioner being that any additional business would congest

the yards of the Great Northern. The amount of extra trans-
portation to be obtained, which was the alleged object of the
petitioner in condemning this strip of ground, was so small
that it could scarcely be taken into consideration in relation
to the question of congestion. But, conceding that additional
business would congest the terminal grounds of the Great
Northern, that would be no reason for incommoding the de-
fendant company and congesting its terminal grounds. For
the court finds, and the testimony positively shows, that the
International Railway Company had not obtained any more
terminal facilities than it needed, nor as much; that it would
be crowded for room; that it could not obtain any more
room on the north by reason of its close proximity to the
O. R. & N. Company's terminal grounds, nor on the south
by reason of the river. Hence, if this testimony was true,
the taking would simply be relieving one company at the ex-
pense of another, and no authority, we think, would grant
a condemnation of the property of one railroad by another
for such alleged reasons.

It is true that the International railroad is not yet in
operation, but the testimony shows that a large portion of
the grading has already been contracted for, and that the
whole road will be in operation in the near future; that it
has traffic relations with the Canadian Pacific, and expects
to be in reality the western portion of a transcontinental
road. Although it is not yet in operation, companies of this
kind must procure grounds for terminal facilities before they
commence their operations. The necessity of the business
requires this, and, when once they make their calculations
to procure these facilities, which this company did at an
expense of $150,000 in purchasing this land, they will be
protected in those terminal rights to the same degree as will
a company which is already operating its roads. This rule
was laid down by this court in a case recently decided, viz.,
*Nicomen Boom Co. v. North Shore Boom etc. Co., ante*
p. 315, 82 Pac. 412 (decided Sept. 30, 1905). The court in

that case, after reviewing the law in relation to railroads and finding that railroads are analogous to boom companies, they both being corporations for public service, said:

"Applying the rule followed in the railroad cases, appellant had the right, after filing its plat of location, to acquire the title to the lands within the limits of its location. It was an absolute right which it could enforce by condemnation proceedings to the exclusion of any other boom company that might seek to appropriate the same land. It did acquire these lands, not by condemnation, but by purchase. Having thus established its location and acquired the necessary lands, it proceeded to construct its boom, but did not construct it throughout the entire located territory, although it has always intended to do so as the public demand might require. We think in reason that the appellant had the right when it filed its plat of location and acquired property for the purpose of constructing its boom, to take into consideration the future requirements of its business, and that it should not be restricted merely to the territory required at the time its first works were erected. It would seem that this must be so, in view of the obligations appellant assumed as a public service corporation."

The lower court in this case, after stating certain matters which were proven, in its findings of fact, says:

"The foregoing facts taken in connection with all the facts and testimony in the case convinces me that the petitioner is not acting in good faith in this matter, but is endeavoring to harass and impede the work of the defendant company; or, at the least, that the building of the line in question is an afterthought. The petitioner could build a line, making the connection it desires, by running to the north of the O. R. & N. tracks and the Union depot grounds aforementioned. The line thus proposed would be but a trifle longer, and it does not appear that it would involve prohibitive expense. None of the officers of the petitioning company or of the Great Northern appear to have endeavored to inform themselves upon the feasibility of this line. The same connection likewise could be made at slightly increased expense, by crossing the Spokane river from the old Spokane Falls & Northern depot to a connection with the Great Northern, and thence by

way of Havermale's Island. The cost of building additional bridges and a slightly increased amount of trackage is the only objection to this course, except that the terminal grounds of the Great Northern are said already to be congested. Save for this latter objection, too, the connection could be made over the lines of the Great Northern from Hillyard to Havermale's Island, and thence across the north fork of the river to the Seattle, Lake Shore & Eastern track. The only increased expense thereby would be the building of one bridge across the north fork of the river. I am unable to find any necessity for the building of the proposed track. I do find, however, that it would render impracticable the use of the proposed terminal grounds by the defendant, and that it has, and can acquire, no other terminal grounds near the business part of the city."

We think the whole testimony justifies this statement by the court. But if only the last part of the statement were true, that it would render impracticable the use of the proposed terminal grounds by the defendant, and the defendant could acquire no other terminal grounds, that would be proper grounds upon which to deny the application.

We think, under all authority and in accordance with just dealing, from a review of the whole record, the judgment of the lower court should be affirmed. It is so ordered.

MOUNT, C. J., CROW, RUDKIN, FULLERTON, and HADLEY, JJ., concur.

ROOT, J., concurs in the result.