[No. 12421.  Department One.  February 2, 1915.]

THE STATE OF WASHINGTON, *on the Relation of Union Trust & Savings Bank et al., Plaintiff*, v. THE SUPERIOR COURT FOR SPOKANE COUNTY *et al., Respondents.*[1]

EMINENT DOMAIN — PROPERTY SUBJECT — ALREADY DEVOTED TO A PUBLIC USE—FUTURE NEEDS — EVIDENCE — SUFFICIENCY.  An electric power company desiring to construct a hydro-electric power plant on its site cannot condemn a power site further up the river which another similar public service corporation, already extensively operating, had acquired for its future needs with the intention of devoting it to the same public use within a reasonable time, and the development of which it now intends to prosecute with diligence, having the means to do so; especially where it clearly appears that, by reason of the more extensive field to be served and the magnitude of its present business, the full capacity of such site will be required as soon as it can be developed in order to keep pace with the natural expansion of its present public service.

SAME—PRESUMPTIONS.  Property acquired by a public service corporation in reasonable anticipation of its future needs, is deemed devoted to a public use until abandonment of intention to so use it.

Certiorari to review a judgment of the superior court for Spokane county, Sullivan, J., entered September 26, 1914, adjudging a public use and necessity in eminent domain proceedings, after a trial to the court.  Reversed.

*Graves, Kizer & Graves,* for relators.

*H. M. Stephens, H. S. Stoolfire,* and *Burcham & Blair,* for respondent.

PARKER, J.—Certiorari to review an order of public necessity entered in an eminent domain proceeding.

The Spokane & Inland Empire Railroad Company will hereafter be called the relator.  The Spokane Valley Power Company will be called the respondent.  The relator was incorporated as a public service corporation in 1906, for the purpose of taking over the properties of the Spokane Trac-

[1] Reported in 145 Pac. 999; 149 Pac. 324.

tion Company, organized in 1903, which had built and was operating street railway lines in Spokane; the Coeur d'Alene & Spokane Railway Company, organized in 1902, which had built and was operating a railway line to Coeur d'Alene, Idaho, and beyond; the Spokane & Inland, organized in 1904, which was building and had partially in operation railway lines in the Palouse country; and the Spokane Terminal Company, organized in 1905, which owned the terminals in Spokane used by the other companies. All of these properties were operated electrically. The relator has a capital stock of $10,000,000 and a property investment of approximately $25,000,000. It acquired from its predecessor a power site on the Spokane river known as the "Nine Mile" site. In 1906, it acquired a power site between the city of Spokane and the Nine Mile site, known as the "Bowl and Pitcher" site. With the Bowl and Pitcher site, it acquired a light and power franchise theretofore granted by the city of Spokane. It paid $50,000 for the power site and franchise. Neither of the original companies owned the electric power for the operation of its property. Each thereof had a separate contract for electric power with the Washington Water Power Company, expiring in 1916. The relator took the properties subject to these contracts.

In April, 1908, the relator entered into a contract with the Washington Water Power Company in lieu of the several separate contracts of its predecessors, whereby it agreed to take the amount of power covered by their contracts until the completion of its Nine Mile plant then in process of construction, and to take thereafter until October 12, 1916, 3,800 horse power. It was agreed that neither the relator nor the three original companies would, prior to October 12, 1916, engage in the sale of electrical power for light or power purposes within the city of Spokane or in the Coeur d'Alene mining district, Idaho; that, thereafter and some time in 1908, the relator completed its Nine Mile power plant, which furnishes a maximum of 15,000 horse power, at a cost of ap-

proximately $1,500,000. It commenced the construction of this plant in 1906. The relator owns and operates a street railway system in Spokane, and interurban lines running into various points in Washington and Idaho. It has a total urban and interurban mileage of 290.94 miles, all of which it operates by electricity. It uses a maximum of 8,900 horse power in the operation of its railway system, and furnishes 2,600 horse power for irrigation enterprises, making a total of 11,500 horse power devoted to a public use. When its contract with the Washington Water Power Company expires in 1916, it will not have sufficient power for these uses. For some time prior to the commencement of the work on the Nine Mile plant in 1906, the relator was considering the relative feasibility of the two sites, and hesitating as to which site it should first develop.

The respondent was incorporated as a public service company in 1913, with a capital stock of $200,000 fully subscribed. Between that date and September 30, its stockholders conveyed to it certain overflow and water rights on the banks of the Spokane river for a consideration of $200,-000. They took stock to the extent of $142,500 and placed the balance of $57,500 in the treasury. The stock is assessable to the extent of twenty-five per cent of its par value. Some of the respondent's land is above and some below the Bowl and Pitcher site which it seeks to condemn. The respondent's proposed power plant would create a lake about seven and one-half miles in length with the relator's land near the center. It cannot develop its plant without acquiring the relator's land. In January, 1914, the respondent commenced work at its dam site. On March 20, its trustees directed that the construction work should be prosecuted with diligence. In April, it began certain condemnation proceedings against other parties. In May, it made a tentative arrangement with the Spokane & British Columbia Railway Company to furnish it electric power. It expended before the hearing of this cause several thousand dollars in the

prosecution of its proposed enterprise. The respondent desires to construct a hydro-electric plant at its site on the Spokane river below the Bowl and Pitcher site. The plan which the respondent proposes to carry out would cost about $1,500,000.

The relator acquired the Bowl and Pitcher site in anticipation of its future needs; that is, it foresaw that, within a reasonable time, it would require the power which the two sites would develop to meet its needs in the operation of its system in the progress of its anticipated expansion, and in furnishing power for public use as an auxiliary to the full development of its system. Its good faith in acquiring and holding the Bowl and Pitcher site is shown by its several resolutions between April, 1906, and October, 1906. That it intends to develop this site is shown by its resolution of April 15, 1914, wherein it was resolved:

"That for the purpose of developing electric power to be used for the operation of its own and other railway lines and to enable this company to utilize its franchise in the city of Spokane and in other cities and towns where it may now have or hereafter acquire franchises for the disposal of electric current for the public, that the company with all convenient dispatch proceed to construct a dam and power plant on the Spokane river,"

upon the lands in controversy. It was further resolved that the president of the company,

"Be and he is hereby authorized and directed to cause the necessary surveys to be made and plans to be drawn for the construction of a dam and power plant, to acquire such additional lands and such flowage rights as may be necessary for the proper development of electrical power . . . to make such financial arrangements as may be necessary for the construction of the plant and the development and utilization of electrical power thereat, to enter into any and all necessary contracts for construction, machinery and additional engineering . . . and to do any and everything necessary or desirable for the construction of a power plant at the point aforesaid, and the development and utilization of electrical power thereat."

It was further resolved that he should apply to the Federal government for flowage rights upon such of the Fort Wright grounds as the engineer's report should show to be necessary in the development of its plant, and apply for and obtain additional franchises from counties, cities, and towns which may be necessary or convenient in the utilization of the electric power to be developed, make contracts with municipalities or railway companies for the disposal of any power not needed for the purposes of the company, for public purposes, and execute in the name of the relator all contracts proper for the complete execution of the powers granted.

Mr. Wickersham, the relator's electrical engineer, testified:

"To sum it up, however, I might say that the average increase for each year from 1909 to 1914 has been about 20 per cent a year, and on that basis we assume that five years will double the capacity of the present load. That has been checked by checking each individual consumer and analyzing the possibilities of his plant and considering our own requirements, without considering any extensions or any natural reserve that a power company should carry, and also taking over the Washington Water Power load, and we are convinced after the analysis that by the year 1918 the Inland Company will have to supply a load of approximately 25,000 horse power. Should any additional extensions be made, or we have the opportunity to sell power in Spokane, as we will after the year 1916, or receive larger consumers than we know of now, we may have to supply 8,000 to 10,000 horse power more. That is a reserve that any power company for its own safety should provide sufficiently far ahead of the actual demand for the power, so that in the year 1920 the Inland Company will be required, or should have to serve its interests, at least 35,000 horse power, which is the combined output of both the Bowl and Pitcher and the Nine Mile plant."

Mr. Gilman became the relator's president in January, 1914. He testified that the board of directors had directed the development of power at the site in controversy; that it

had the ability to do so, and that it intended to do so. He further said:

"That for an electric system like ours the power is the heart of the system, and if we are stripped of our ability to produce power we are limited in our operations to the power that we have at the present time so that when the country grows—when the Palouse is cut up, for example, and it is necessary to double track, or extend our lines as the city grows, and we are required to extend our street car lines, or to put more cars or more service on the present lines, we will not have the ability to do so, because we will not have the power."

It would take two years, that is two seasons of low water, to complete the plant at either site. The relator cannot complete the development of a plant at its site without acquiring flowage rights for the back water. In this respect the parties stand upon an equal footing.

Our statute, Rem. & Bal. Code, § 925 (P. C. 171 § 176), provides that, before property can be taken for a public use, two facts must be made to appear: (1) that the contemplated use for which the property is sought to be appropriated is "really a public use," and (2) "that the public interest requires the prosecution of such enterprise." All property is held subject to the power of the state in the exercise of its sovereignty to appropriate it to a public use. Public service corporations are only permitted to exercise the power of eminent domain, an attribute of sovereignty, when the public interest will be promoted. We have held that property owned by a corporation and devoted to a public use cannot be taken by condemnation except in special cases not here present, to be used for the same purpose and in the same manner. *Samish River Boom Co. v. Union Boom Co.*, 32 Wash. 586, 73 Pac. 670; *State ex rel. Harbor Boom Co. v. Superior Court*, 65 Wash. 129, 117 Pac. 755; *State ex rel. Skamania Boom Co. v. Superior Court*, 47 Wash. 166, 91 Pac. 637. We have also held that property owned by a corporation "and not actually devoted to a public use" may be

acquired by condemnation. *Samish River Boom Co. v. Union Boom Co., supra.* The right to condemn in a particular case depends upon all the attending facts and circumstances. *Samish River Boom Co. v. Union Boom Co., supra.* It has become the settled law of the state that a public service corporation may acquire property by condemnation or otherwise in reasonable anticipation of its future needs. When property has been so acquired, it is deemed devoted to a public use although not actually devoted to such use, until there has been an abandonment of the intention so to use. *Nicomen Boom Co. v. North Shore Boom & Driving Co.*, 40 Wash. 315, 82 Pac. 412; *State ex rel. Spokane Falls & N. R. Co. v. Superior Court*, 40 Wash. 389, 82 Pac. 417; *Neitzel v. Spokane International R. Co.*, 80 Wash. 30, 141 Pac. 186; *Spokane v. Merriam*, 80 Wash. 222, 141 Pac. 358.

In the *Nicomen Boom Company* case, this court, speaking through Judge Hadley, said:

"It is also held that the question of future needs of railroad companies, in fulfilling their charter purposes and performing their public duties as common carriers, is one which should be given full consideration by a court before it undertakes to deprive a company of any part of its right of way in favor of another corporation. Such companies may anticipate future necessities and may, for that purpose, hold territory not in actual use to the exclusion of other companies."

In the *Spokane Falls & N. R. Co.*, case, it was said by Judge Dunbar, speaking for the court:

"It is true that the International railroad is not yet in operation, but the testimony shows that a large portion of the grading has already been contracted for, and that the whole road will be in operation in the near future; that it has traffic relations with the Canadian Pacific, and expects to be in reality the western portion of a transcontinental road. Although it is not yet in operation, companies of this kind must procure grounds for terminal facilities before they commence their operations. The necessity of the business requires this, and, when once they make their calculations to procure these facilities, which this company did at an

expense of $150,000 in purchasing this land, they will be protected in those terminal rights to the same degree as will a company which is already operating its roads."

In the *Neitzel* case, we said:

"A public service corporation may anticipate future needs, and mere nonuser of a portion of its easements does not, of itself, constitute an abandonment. Whether or not there has been an abandonment depends upon the intention of the owner of the easement. While such intention may be deduced from long nonuser, the nonuse itself does not constitute an abandonment, and does not of itself defeat or impair acquired rights."

In the *Merriam* case, we voiced the same principle, saying:

"It was not incumbent upon the city to show an immediate necessity for an immediate use. The showing of a reasonable necessity for use in a reasonable time is all that can be required. A municipal corporation has the same right to be provident and forehanded in the acquirement of property for a public use that a public service corporation has."

In *State ex rel. Weyerhaeuser Timber Co. v. Superior Court*, 71 Wash. 84, 127 Pac. 591, we recognized the rule of comparative necessity, saying:

"Whether the use is a public use, and whether the public interest requires the prosecution of the enterprise, and what lands etc. are necessary for the enterprise, are all matters referred to the court for determination. Rem. & Bal. Code, § 925. From this results the doctrine which, for lack of a better name, may be called comparative necessity. If by the plan proposed the present and future public use and interest, as now apparent from the evidence, are met, that is as far as the court need now inquire."

The respondent has cited *Tacoma v. Nisqually Power Co.*, 57 Wash. 420, 107 Pac. 199, and *Newell v. Loeb*, 77 Wash. 182, 137 Pac. 811. In each of these cases the proceedings were conducted under a different statute, as will appear from a reading of the cases. In *Roberts v. Seattle*, 63 Wash. 573, 116 Pac. 25, the city condemned a strip of land thirty feet in

width along the boundary of the University ground, for street purposes.    The statute authorized the proceeding and the uses were dissimilar.    In *State ex rel. Milwaukee Terminal R. Co. v. Superior Court*, 54 Wash. 365, 103 Pac. 469, 104 Pac. 175, it was not shown that the defendant would need or use the property in controversy for public purposes, within a reasonable time.    In *North Coast R. v. Northern Pac. R. Co.*, 48 Wash. 529, 94 Pac. 112, it was held that a portion of a railroad right of way through a defile which could be spared without material detriment, could be condemned where the public interest required it.    In all condemnation cases the paramount consideration is the public interest, and to that interest all rights must bow and all rules must bend.    The record shows that the relator acquired the property sought to be condemned with the intention of devoting it to a public use within a reasonable time; that it now intends to prosecute the development of the power site with diligence and that it has the means so to do.    The purposes to which the parties desire to devote the property are the same.

The judgment is reversed, with directions to dismiss.

MORRIS, C. J., CROW, and CHADWICK, JJ., concur.

## ON REHEARING.

### [*En Banc*.   June 12, 1915.]

PER CURIAM.—Upon a rehearing *En Banc*, a majority of the court adhere to the opinion heretofore filed herein.    For the reasons there stated, the judgment is reversed, with directions to dismiss.