[Civ. No. 4313.   Third Appellate District.—February 15, 1932.]

EAST BAY MUNICIPAL UTILITY DISTRICT (a Public Corporation), Respondent, v. CITY OF LODI (a Municipal Corporation) et al., Appellants.

742

Robert M. Searls, Glenn West, Edward R. Solinsky, Frank J. Solinsky, Corbet & Selby and Humphrey, Searls, Doyle & MacMillan for Appellants.

T. P. Wittschen, L. W. Irving, Harold Raines, John Hancock, Joseph H. Huberty and Charles P. Snyder for Respondent.

PLUMMER, J.—While a rehearing was granted in this cause for the purpose of re-examining the question of damages, owing to the fact that some corrections should be made in the opinion heretofore filed herein, we think it is more convenient to discard our first opinion entirely and restate our views in full, following the general statement heretofore made in this cause.

The plaintiff had judgment in an eminent domain proceeding condemning the riparian rights of the defendants in and to the waters of the Mokelumne River, in so far as said rights pertain to the lands and premises described in the plaintiff's complaint. From this judgment the defendants appeal.

The lands and premises involved comprise about 207 acres situate along the Mokelumne River in Amador and Calaveras Counties, are unsuitable for agricultural purposes, are mostly rocky and barren and are susceptible of being used for grazing purposes only to a limited extent. The lands and premises belonging to the defendants are divided by certain lands and premises belonging to the United States, reserved from entry except for power purposes, and also a certain tract of land belonging to a private owner.

The court found that the lands and premises of the defendants could be used for power purposes by building a dam thereon, which would raise the waters of the river, giving a head of not exceeding 43 feet, without inundating the lands belonging to the general government, but if the intervening tracts between the lands owned by the defendants were submerged, the waters of the river might be so raised as to give a head of 57 feet.

While not so found, the testimony shows that a head of water to the extent herein mentioned, would operate a power plant of some capacity, the extent of which does not satisfactorily appear.

The Mokelumne River has its source in the Sierra Nevada mountains, approximately 100 miles easterly of the City of Lodi, and flows in a general westerly course to its con-

fluence with the San Joaquin River, at a point between 15 and 20 miles from the City of Lodi. During certain seasons of the year it carries a large body of flood waters, occasionally approximating a flow of 60,000 cubic feet per second. Thereafter it rapidly decreases during certain summer months, until the flow does not exceed 100 cubic feet per second. Until the year 1923 no action had been taken by any municipality to impound either the natural flow or the flood waters of the Mokelumne River.

For the purpose of utilizing the waters of the Mokelumne River, so far as possible to supply the domestic demands of the cities of Oakland, Berkeley, Alameda, Emeryville, Piedmont, Albany, Richmond and El Cerrito, an election was held on May 22, 1923, for the purpose of organizing the East Bay Municipal Utility District, with exterior boundaries including the cities above mentioned. This election resulted in the organization of the plaintiff as a Utility District. Investigations were had as to the availability of the waters of the Mokelumne River for the purposes mentioned, and also to ascertain for what power uses said waters might be applied, and thereafter, on November 4, 1924, an election was had authorizing a bond issue in the sum of $39,000,000 for the construction of what was thereafter called the Mokelumne River project. Some litigation followed relative to the validity of the bonds offered for sale by the district, which resulted favorably, and on September 25, 1925, contracts were entered into for the construction of the major units of the project, and actual work was begun. Thereafter, eminent domain proceedings were had, whereby the district secured the use of approximately 8,000 acres of land for use as a reservoir site. These proceedings were had in 1927. For the purposes of impounding the waters of the river and rendering them available for use, the district began the building of a certain dam called the "Pardee Dam", and continued work thereon, and at the time of the execution and delivery of a deed by the Colorado Power Company to the City of Lodi, hereinafter mentioned, had expended upon the Pardee Dam, conduits, etc., upwards of $34,000,000, a sum slightly in excess of $15,000,000 thereof having been expended upon the construction of the dam. In addition to this, the Utility District has expended on tunnels, aqueducts, and

acquiring distribution systems, an aggregate sum in excess of $64,000,000.

Prior to the institution of this suit no action had been taken with reference to the riparian rights of any owners of land on the Mokelumne River below the site of the Pardee Dam, apparently the contention of the district being that the impounding of the flood waters of the Mokelumne River during the flood season of each year, would enable the district to release from its reservoir a quantity of water sufficient in volume that the riparian rights of lower land owners would not be impaired.

Beginning with September, 1926, and ending with July, 1927, one Lloyd Thayer acquired title to the various parcels of land involved in this action, and thereafter organized the Colorado Power Company, and conveyed the premises to the company so organized.

During the period of time elapsing between the commencement of construction work by the Utility District, and some time in the year 1928, Thayer had some negotiations with the Utility District relative to the district advancing a sum in the neighborhood of $100,000 to build a dam for impounding waters upon the lands to which he had acquired title. These negotiations did not result in the district advancing any money, and some time later the Colorado Power Company sent a letter to the Utility District in which it was stated that the Power Company proposed to develop power as a riparian owner, and notified the Utility District not to proceed with any construction work that would interfere with the natural flow of the Mokelumne River above the Colorado Power Company's project. This was about three years after work had been begun upon the Mokelumne River project by the Utility District, and after the district had expended thereon a sum in excess of $15,500,000.

On the ninth day of January, 1929, so far as the record shows, without any previous negotiations, the Colorado Power Company delivered to the City of Lodi a deed of conveyance signed by Lloyd W. Thayer, as president, and Albert P. Slichter, as secretary, whereby the Power Company transferred to the City of Lodi, all and singular, the premises described in the plaintiff's complaint. This deed contains, among other things, the following terms and conditions: ''Whereas the grantor and the grantee consider the

said premises are adaptable and necessary for the construction thereon and operation of a hydroelectric power plant for the generation of electric energy and the transmission of such energy therefrom to serve the inhabitants of the City of Lodi; and whereas, the grantee now owns and operates a municipal electric distribution system adapted to the distribution of electric energy to be generated on the premises hereinafter described by and through the construction and operation of the said power plant, together with the construction and operation of transmission lines connecting the said present distribution system of the City of Lodi with the said hydroelectric power plant; Now, therefore, in consideration of the premises and of the sum of $10.00 to it in hand paid, the receipt of which is hereby acknowledged, and upon other good and valuable considerations to it thereunto moving, the grantor hereby grants and conveys to the grantee all of that certain property above referred to, situate in the counties of Amador and Calaveras, State of California, and more particularly described as follows: (Here follows a particular description of the lands and premises aggregating some 200 acres). To have and to hold the said premises and appurtenances, unto the grantee, its successors and assigns forever, for public use in the generation and production of electric energy for the use of the inhabitants of the City of Lodi, subject, however, to the following conditions subsequent, the happening of any one of which shall operate to terminate and defeat the title of the grantee in said premises and revest the same in the grantor hereunder.'' Six conditions are then set forth in the deed, a failure to comply with any one of which would revest title in the grantor. The first condition specified that the grantee should accept the deed, with the conditions, within ten days after the tender of the same. The second condition, that the grantee should, within one year after the receipt of the deed, cause a final investigation of the engineering features necessary to be made prior to the construction of any power plant, and report the same to the grantor. The third condition specified that the grantee should, within two years from and after the date of the deed, call an election for the purpose of having it determined by the electors of the City of Lodi, whether a bond issue would be authorized to pay the expenses of constructing such hydroelectric plant and trans-

mission lines. The fourth condition specified that the grantee should, within three years from and after the date of the deed, enter into a binding contract with a responsible contractor for the construction of the projected works, including the power plant and transmission line, and notify the grantor of the awarding of such contract. The fifth provision specified that the grantee should, within four years from and after the date of the acceptance of the deed, have completed a power plant having a rated capacity of 3,000 kilowatts, together with a transmission line connecting said power plant with the distribution system owned by the grantee. The sixth condition specified that the grantee should not fail, for a period of three months, to operate the plant, and should cause to be paid to the grantor, in semiannual installments, a royalty of 2 mills per kilowatt hour for each kilowatt hour of electric energy generated at said plant, in semi-annual payments, for twenty-five years, payments to be made within thirty days after the expiration of each semi-annual period; that the payments should never be less than $5,000 semi-annual, nor more than $10,000 semi-annual, irrespective of the quantity of energy delivered, or to the extent to which the plant might be operated. A failure to comply with any of the conditions set forth in the deed would cause the title to revest in the grantor.

At the same meeting of the council, when the deed just referred to was tendered by the representatives of the Colorado Power Company to the City of Lodi, the council adopted resolution No. 567, which contained, among other things, the following: After reciting that in the judgment of the representatives of the company and of the council, the project referred to was economically adapted as a site for the development of a municipality owned electric power plant, the resolution reads: "Whereas, the conditions attached to the tender of the said deed are that the City of Lodi accept the deed, conveying the property of the Colorado Power Company, as hereinafter described, and such title to the said property as the Colorado Power Company now has, subject to certain conditions subsequent expressed in said deed, and that the settlement or dismissal or any litigation now pending, or which may follow the acquisition of title to the said property by the City of Lodi, affecting the riparian rights to the flow of the Mokelumne River through the said property,

which rights are part and parcel of the said property, shall be satisfactory in terms to the Colorado Power Company and approved by it; and whereas, the City Council of the City of Lodi believes that the conditions attached to said offer of conveyance are reasonable, do not involve any present heavy commitment to expenditure by the City of Lodi, and should be accepted; Now, Therefore, be it, and it is hereby resolved that said conditions attached to said tender be, and they are hereby accepted, and that the clerk of this Board is hereby authorized and directed to notify said Colorado Power Company, in writing, of such acceptance, and to transmit to said Company a copy of this resolution; and be it further resolved, that the said property so conveyed to the City of Lodi in said deed is hereby appropriated and dedicated to public use, to-wit: as a site for the construction of a reservoir, power-house, bus-yard, operators' quarters and other appurtenant structures to be designed, constructed and used in the generation of electric energy for the use of the city of Lodi and its inhabitants." The resolution then further authorized the city engineer to make examinations and explorations of the site of the proposed plant, and to report his findings to the council. The city attorney was likewise directed to prepare and submit to the council a report seting forth the legal procedure necessary for the presentation to the electors of the City of Lodi of a plan for financing construction and operation of said works. The city attorney was authorized also to negotiate with the proper state and federal authorities in obtaining permits and licenses necessary and expedient. The city attorney was also authorized to take such steps to prosecute or defend any litigation which might be necessary for the protection of the rights of the City of Lodi, in and to the riparian flow of the waters of the Mokelumne River; also, to protect the contingent interests of the Power Company. It was further provided that none of the litigation should be settled without the consent of the Power Company. It was further provided that the rights of the City of Lodi acquired under the deed should not be transferred without the consent of the Power Company, other than to a water district organization, to include the City of Lodi. It was further provided that in the event of any adverse proceedings being taken and had, and the title to the premises or the riparian rights transferred to, or

vested in any adverse party, that the amount of damages awarded therefore should be first applied to the repayment of any expense and costs acquired by the City of Lodi, and the surplus, if any, divided between the City and the Power Company in the following proportions: Seventy-five per cent to the Power Company and twenty-five per cent to the City of Lodi.

The record shows that the instruments just referred to were presented to the city council of the City of Lodi on the evening of the 9th of January, 1929, by representatives of the Power Company, and the proceedings then had included the delivery of the deed in the passage of the resolution referred to and the authorization of the institution of injunction proceedings against the Utility District. The mayor of the City of Lodi testified that no consideration was paid by the City of Lodi, no bond election had been called up to the time of the trial of this action, and practically no further proceedings had been taken and had, other than a very limited exploration made of the premises by the city engineer, or an engineer employed for that purpose.

It appears also from the record that the council was advised that their position in the pending litigation, which litigation involved the water-level in the wells from which Lodi derived its water supply, would be strengthened by going into the Colorado deal. No investigation was made as to the purchase price of the premises involved, paid by Thayer, which the record shows aggregated the sum of $9,475. The representatives of the Power Company, in explaining the project to the council, did not state how much the project would cost, nor was the purchase price of the premises mentioned. Mr. Thayer never informed the council as to the amount of money he had paid for the lands included in the deed, nor was anything said as to what the Colorado Power Company had paid therefor. The record shows that no application was ever made to the federal power commission to use the lands owned by the federal government. It was further shown that it was the intent of the council to meet the expense of the project by a bond issue. The record further shows that an election was held to organize a water district which included the City of Lodi, and the project was voted down. The record further

shows that the City of Lodi did not have in its treasury sufficient funds to finance the project; that a bond issue would be necessary; and that the bonds of the City of Lodi already outstanding were so great in amount as to render improbable that a bond issue could be voted sufficient to defray the expense of the building of the dam, the hydroelectric plant and the transmission line, without violating the constitutional provision limiting the indebtedness of the city to a certain percentage of the assessed valuation of the property within its corporate limits.

█ With this summary in view, one vital question is tendered for consideration, to wit: Were the circumstances and transactions connected with the property involved such as to render the same immune as against eminent domain proceedings under the last sentence of paragraph 4 of section 1240 of the Code of Civil Procedure, which reads: "But property appropriated to the use of any county, city and county, incorporated city or town or municipal water district, must not be taken by any other county, city and county, incorporated city or town or municipal water district, while such property is so appropriated and used for the public purposes for which it has been so appropriated"? This language implies that the property to be rendered immune must not only be appropriated, but also used for a public purpose. As construed by the authorities which we shall hereafter cite, the word "used" does not mean actual physical use at the date of the institution of the condemnation suit, but means property reasonably necessary for use, and which the circumstances reasonably show will be actually used within a reasonable length of time. If the use is contingent, uncertain or problematical or not reasonably definite as to time, eminent domain proceedings are not barred. If the circumstances disclosed upon the trial of the cause are such as to justify the trial court in concluding that the projected use is contingent, uncertain, problematical or not reasonably definite as to time, then and in that case an appellate court has no power to interfere, unless error otherwise appears in the trial, necessitating a reversal.

In the consideration of the questions presented and determined by the trial court, it must be remembered that the water supply of the City of Lodi is not involved, and that

the City of Lodi was already being supplied with electric power for use over its distributing system. In arriving at a conclusion the court had for its consideration all the conditions existing at the time of the beginning of this action, and also that the premises set forth in the deed of conveyance executed and delivered by the Power Company, rendered the title of the City of Lodi all the while more or less contingent and subject to loss; that the City of Lodi had no money in its treasury to finance the project; that a resort to taxation to raise the necessary funds to defray the expenses of the undertaking would impose a very heavy burden; that in order to float a bond issue covering the cost of the undertaking would require a two-thirds vote of the electors of the City of Lodi; that no such election had been called, although nearly two years had elapsed between the receipt of the deed and the trial of this cause; that the resolution adopted by the City of Lodi, recited among other things, that the city was not committing itself to any heavy expenditures; that the deed was accepted and the resolution for appropriation adopted without any previous exploration of the project, without any ascertainment of its proposed cost, and any definite knowledge or information had in relation thereto, or as to whether the City of Lodi, even though willing, could legally incur the necessary expenditure. Likewise, the resolution indicated that no immediate use was contemplated, and that the council, at the time of passing the resolution, was not definitely committing the City of Lodi to any expenditure of money, or to any obligations whatever to the public with regard to the projected works, but had in mind that it would aid the City in its contest to conserve its underground supply of water and at least enable the city to share in whatever recovery might be had in the way of damages in the event that the use of the waters of Mokelumne River for power purposes by the city or the Power Company should be subjected to the uses of the Utility District by eminent domain proceedings. The findings of the trial court were and are to the effect that the lands involved in this action are bare and unimproved, and were not, on the ninth day of January, 1929, or at any other time, dedicated to any public use, and were not, and are not in process of being put to any public use, and that the City of Lodi has not been proceed-

ing with reasonable or any diligence, to put said lands, or any part thereof, or of any water rights appurtenant thereto, to any beneficial use.

The court further found that the waters of the Mokelumne River could be utilized by the plaintiff to the extent and for the purposes proposed by the plaintiff without destroying the adaptability or feasibility of the lands of the defendants for power purposes.

The court further found that if the lands and premises of the defendants were depreciated in value to any extent, such depreciation did not exceed the sum of $10,000, which sum was allowed as compensation for damages on account of the subjection of the riparian rights appurtenant to the lands involved being subjected to the uses of the plaintiff in this action.

The trial court also found that the amount of the bonded indebtedness which would be required to construct the power project and transmission line, in addition to the amount of the present outstanding bonded indebtedness of the City of Lodi, would exceed fifteen per cent of the total assessed valuation of the property within the limits of the city.

In support of their appeal the appellants cite a number of cases to the effect that property appropriated to public use by one municipality cannot be taken by condemnation proceedings for the uses and purposes of another municipality. This, of course, is in accordance with the statutory law of this state. The cases cited, however, are distinguishable from the circumstances here presented.

In the case of *Mono Power Co.* v. *City of Los Angeles*, (C. C. A.) 284 Fed. 784, cited as controlling here, the facts show that the Southern Sierras Power Company, to which the property had been conveyed, was engaged in the transmission of power to a number of different cities; that while the Southern Sierras Power Company had only recently acquired the property in dispute preceding the institution of eminent domain proceedings by the city of Los Angeles, it was proceeding to utilize the property, and there were not any contingencies relative to either the immediate or prospective uses of the property by the Power Company. The means, the ability, the immediate and actual use, were all present to support the rights of the Power Company, and to render the property being used immune as against any condemnation

proceedings. In other words, there was both appropriation and use, complying strictly with the requirements of subdivision 4 of section 1240 of the Code of Civil Procedure.

In *State ex rel. Union Trust & Sav. Bank et al.* v. *Superior Court, Spokane County, et al.*, 84 Wash. 20 [145 Pac. 999, 149 Pac. 324], as appears from the opinion, the findings of the trial court and the record shows that the property acquired was held for future use, and the court said, quoting from the syllabus: "A corporation constructing a hydro-electric power plant for a public purpose cannot condemn a power-site owned by another public utility corporation which intends to construct thereon a similar power plant, since property owned by a corporation and devoted to a public use cannot be condemned by another corporation for use in the same manner and for the same purpose." Here, again, are no circumstances showing the future use to be problematical.

The case of *Marsh Min. Co.* v. *Inland Empire Min. & Mill. Co.*, 30 Idaho, 1 [165 Pac. 1128], is simply to the effect that eminent domain proceedings will not enable one claimant to condemn property where the condemnor is merely seeking to subject the property to similar uses to which it is already being applied.

In *State ex rel. South Fork Log Driving Co.* v. *Superior Court, etc.*, 94 Wash. 691 [163 Pac. 15], the Supreme Court of Washington held that property not presently actually devoted to a public use, but purchased and held by a public service corporation in reasonable anticipation of future needs, is deemed devoted to a public use. Here, again, enters a question of fact to be determined by the trial court as to whether the property has been acquired, and is being held in reasonable anticipation of future use, upon which determination of fact, if supported by the testimony, the finding of the trial court cannot be disturbed.

The case of *Nicomen Boom Co.* v. *North Shore Boom & Driving Co.*, 40 Wash. 315 [82 Pac. 412], involved the question of abandonment of property after having been acquired, which differentiates everything said in the opinion in that case from the circumstances here presented.

In 20 C. J. 601, the law is thus stated: "Land owned by a corporation whose business constitutes a public use, not in actual use nor essential to the exercise of its franchise,

stands on the same footing as that of a private individual, and may be condemned by another corporation under the general laws. Nevertheless, there must be a liberal consideration of the future, as well as the existing needs of the Company whose land is sought to be appropriated, before it can be deprived of any portion thereof; but the mere possibility that the land sought to be taken may at some future time become necessary to the exercise of the franchise of the Company owning it, does not exempt it from condemnation.'' Again, the facts and circumstances surrounding the case must be considered in determining the application of this statement of the law as to the possibilities and contingencies relating to the use, and whether the owner possesses the ability to devote the same to a public use, and whether the conditions are such as to make the public use contingent and problematical.

We do not find anything in the case of *Los Angeles* v. *Los Angeles Pacific Co.,* 31 Cal. App. 100 [159 Pac. 992], applicable here.

In *Vermont Hydro-Electric Corp.* v. *Dunn,* 95 Vt. 144 [12 A. L. R. 1495, 112 Atl. 223], a case cited by appellants and also by respondent, we find a very full statement of the law and citation of authorities which we think amply sustains the judgment of the trial court in this action. It is there shown that there must be a reasonable probability of use of the property, within a reasonable time; that the exemption does not apply if the use is indefinite and uncertain; and that it must be used without any unreasonable delay. The opinion in this case is so full and complete that we quote therefrom extensively, as follows: ''It is the settled law of this State that property already legally appropriated to a public use cannot be taken for another public use without legislative authority expressly given or necessarily implied. (*Rutland-Canadian R. Co.* v. *Central Vermont R. Co.,* 72 Vt. 128, 133 [47 Atl. 399]; *Rutland R. Light & P. Co.* v. *Clarendon Power Co.,* 86 Vt. 45, 50 [44 L. R. A. (N. S.) 1204, 83 Atl. 332].) To bring property within the immunity from condemnation under general legislative authority, it is not necessary that it be acquired by eminent domain. If its owner has devoted it to a public use which he is under a legal obligation to maintain, it comes within the protection of the rule. (2 Nichols Em. Dom. 364; 2

Lewis Em. Dom., 3d ed., 443; *Rutland R. Light & P. Co.* v. *Clarendon Power Co., supra; Barre R. Co.* v. *Montpelier & W. River Co.,* 61 Vt. 1 [15 Am. St. Rep. 877, 4 L. R. A. 785, 17 Atl. 923]; *In re Saratoga Avenue,* 226 N. Y. 128 [123 N. E. 197].) And it is not necessary that the property be actually in use for a public purpose to exempt it from the proceeding. In other words, it may be appropriated or devoted to a public use within the law of eminent domain, without being actually put to such use. (*Rutland R. Light & P. Co.* v. *Clarendon Power Co., supra; In re Newport Avenue,* 218 N. Y. 274 [112 N. E. 911]; *New Haven Water Co.* v. *Wallingford,* 72 Conn. 293 [44 Atl. 235].) But a mere voluntary assumption of public service which may be abandoned at any time does not carry with it the privilege of exemption. The test whether land is held for a public use, such as will exempt it from condemnation is said not to be what the owner does or may choose to do, but what, under the law, he must do, and whether a public trust is impressed upon it. A corporation does not so hold its property impressed with a trust for the public use, unless its charter or the general law puts that character upon it so that it cannot be shaken off. (*In re New York L. & W. Co.,* 99 N. Y. 12 [1 N. E. 27].) While land kept by a corporation bound by law to serve the public in reasonable anticipation of future needs, cannot be seized from a different public use under general authority, land held for purposes other than those pertaining to its franchise may be taken as freely as from a private individual. (2 Nichols Em. Dom. 364, and cases there cited.) The element of necessity plays an important part in the determination of the question. While liberal consideration should be given to the future as well as the existing needs of the corporation, the 'exemption will not extend to property held for future use upon the mere possibility that it may at some future time become necessary to the exercise of its corporate franchise. Reasonable expectation of future needs is required to protect the property from condemnation. (*Scranton Gas & Water Co.* v. *Delaware L. & W. R. Co.,* 225 Pa. 152 [73 Atl. 1097]; *Goldfield Consol. Mill & Transp. Co.* v. *Old Sandstrom Annex Gold Min. Co.,* 38 Nev. 426 [150 Pac. 313]; *Cincinnati S. & C. R. Co.* v. *Belle Centre,* 48 Ohio St. 273 [27 N. E. 464]; 20 C. J. 601.) The court must

deal with conditions that exist at the time condemnation is asked. (*Kansas & T. Coal R. Co.* v. *Northwestern Coal & Min. Co.*, 161 Mo. 228 [84 Am. St. Rep. 717, 51 L. R. A. 936, 61 S. W. 684].) Nor is the exemption indefinite in point of time, but the property must be subjected to the use for which it is held within a reasonable time. (*Denver Power & Irr. Co.* v. *Denver & R. G. R. Co.* [*Denver Power & Irr. Co.* v. *Colorado & S. R. Co.*], 30 Colo. 204 [60 L. R. A. 383, 69 Pac. 568]; *East Hartford Fire Dist.* v. *Glastonbury Power Co.*, 92 Conn. 217 [102 Atl. 592].) The general rule to be gathered from the authorities is that property is devoted to, or held for a public use so as to be exempt from condemnation for a different public use under general authority, when used in immediate and necessary connection with a public trust, or when acquired by a public service corporation for a necessary purpose pertaining to its franchise, and held in reasonable anticipation of its future needs, with a *bona fide* intention of using it for such purpose within a reasonable time. For additional cases, see *State ex rel. Union Trust & Sav. Bank* v. *Superior Court*, 84 Wash. 20 [145 Pac. 999, 149 Pac. 324]; *State ex rel. South Fork Log Driving Co.* v. *Superior Court*, 94 Wash. 691 [163 Pac. 15]; *St. Louis A. & T. H. R. Co.* v. *Belleville City R. Co.*, 158 Ill. 390 [41 N. E. 916]; *In re Rochester H. & L. R. Co.*, 110 N. Y. 119 [17 N. E. 678].

"It follows that to sustain the plaintiff's claim that the property in question is held devoted to a public use, it should appear that it is reasonably necessary to a proper discharge of the plaintiff's legal obligation to the public, and that in good faith it intends to use the property for such purpose without unreasonable delay. These are largely questions of fact to be inferred from the circumstances under which the property is held."

Again, as shown by the case of *State* v. *Chehalis Boom Co.*, 82 Wash. 509 [144 Pac. 719], mere ownership of property by a public service corporation does not render it immune from condemnation. We quote therefrom the following: "The mere fact of ownership of this property by respondent, even though it is a public service corporation, is no impediment to the acquisition of such property through eminent domain proceedings by relator. It is not the mere ownership of property by a public service corporation that

protects it from acquisition by another public service corporation seeking to acquire it for a public use by right of eminent domain; but the question of such right by such acquisition must find its answer in the present or prospective use of such property," etc. In that case it appears that the court there was authorized to weigh the comparative advantages flowing to the public by the ownership of the condemnor and condemnee. This, of course, does not enter into the consideration of the case before us. The opinion from which we have quoted cites a number of cases to support the rule just stated.

To the same effect is the case of *Borough of Florham Park* v. *Borough of Maddison*, 77 N. J. L. 260 [72 Atl. 4], where it is said: "Immunity from condemnation accorded to lands held by any municipality for purposes of a water supply . . . is not created by the mere execution and delivery of a deed of lands to a municipality for such purpose, and the acceptance of the same by the common council of such municipality." The same ruling was had in the same case upon a subsequent hearing. (78 N. J. L. 446, 78 Atl. 753.) To the same effect is the case of *East Hartford Fire Dist.* v. *Glastonbury Power Co.*, 92 Conn. 217 [102 Atl. 592], where the Supreme Court of Connecticut held that the mere ownership of property did not exempt it from condemnation proceedings. (See, also, *Indiana Power Co.* v. *St. Josephs etc. Power Co.*, 159 Ind. 42 [63 N. E. 304, 64 N. E. 468].)

The respondent urges the fact that the appellants stood by for a number of years, to wit, from some time in 1923, until shortly before the institution of these proceedings, made no objection to the work being done by the Utility District, and negotiated to the extent which we have mentioned on the part of Thayer and the Power Company, and also that the City of Lodi had made inquiries as to obtaining electric power from the power plant of the Utility District, and that they are equitably estopped, citing in support thereof a number of cases, two of which we will mention: *Collier* v. *Merced Irr. Dist.*, 213 Cal. 554 [2 Pac. (2d) 790], decided by the Supreme Court August 31, 1931, and the case of *Gravelly Ford Canal Co.* v. *Pope & Talbot Land Co.*, 192 Cal. 4 [218 Pac. 405]. However, these cases and others cited by the respondent in support of estoppel, we think are not wholly applicable, the holding in these cases

being that an injunction will not be allowed to a property owner who has stood by until after great sums of money have been expended in the construction of the power or irrigation project, and that damages only will be allowed. What is said in those cases, however, is pertinent to be considered by the trial court in determining the questions of fact to which we have heretofore referred, as to whether the appellants were or were not complying with the requisites of section 1240 of the Code of Civil Procedure, as to the purposes and uses of the property, and as to the purposes of the conveyance of the property by the Colorado Power Company to the City of Lodi.

We do not find anything in the case of *City of San Diego* v. *Cuyamaca Water Co.*, 209 Cal. 105 [287 Pac. 475], affecting any rule of law hereinbefore stated.

The only specification of error relative to the ruling of the trial court as to the admission and rejection of testimony is that the testimony as to the financial condition of the City of Lodi, its bonded indebtedness, and whether it could or could not legally float an additional bonded indebtedness to construct the projected works, was erroneously admitted. With this contention we cannot agree, as such testimony bore directly upon whether the City of Lodi either would or could make any immediate use for power purposes of the property involved in this action, or whether such use was only remote and problematical. Likewise, the ruling of the court excluding protests against the building of the Pardee Dam by others than the appellants herein was unquestionably correct. Some of the findings of the trial court appear to us to be immaterial, as contended by the appellants, but whether correct or incorrect, they do not affect the vital questions involved herein.

As called to our attention upon petition for rehearing, it appears that the appellants' contention that the trial court erred in adopting an uncertain measure of damages, is well taken. Finding No. 32 of the trial court is as follows: "Finds it is not a fact that without the certainty or assurance of the continued natural flow of said waters of the Mokelumne River in their normal amount or quantity, said lands of defendants would have little or no value, or would be suitable or adapted only for grazing purposes, and in this connection the court finds that the waters of said stream can

be utilized by plaintiff to the extent and for the purposes proposed by plaintiff without destroying the adaptability or feasibility of said lands of defendants for power uses. Finds it is not a fact that the extinguishment of the riparian right to the waters of the Mokelumne River which are appurtenant to said lands of defendants, in the manner and to the extent proposed by plaintiff, will result in a damage to the defendants, or either of them, in the sum of $355,000, or in any sum at all in excess of $10,000; and finds it is not a fact that the fair market value of said riparian water rights appurtenant to said lands of defendants, which plaintiff seeks to condemn and extinguish, as of the date of the issuance of summons in this proceeding is the sum of $355,000, or any sum in excess of $10,000, which sum of $10,000 is the amount of the diminution in the market value of said lands at the date of the issuance of summons herein, because of the said extinguishment and interference by plaintiff with the riparian rights appurtenant thereto.'' This finding is based upon what the respondent, in its complaint, states that it proposes to do, in that in the carrying out of its project, its ultimate purpose is to discharge at the base of the Pardee Dam above the lands of appellants, 750 cubic feet per second of the waters flowing in said river. However, there appears nothing in the record which obligates respondent so to do. It may use its hydroelectric plant at its option, and likewise discontinue its operation at its option. The respondent, as shown by the record, consistently refused to obligate itself, and so use the waters of the Mokelumne River, through its power plant, as to assure to the appellants any certainty that there would be sufficient water flowing in the stream for the purpose of operating its projected power plant if the same should be constructed. From this it follows that finding No. 32 is based upon an uncertainty that leaves the way open for the respondent to inflict additional damages upon the appellants without compensation being made therefor. There being no requirement in the judgment, and nothing in the record which places any burden upon the respondent to so use its power plant and discharge water through the same in such manner as to enable the appellants to construct and use the projected power plant, it follows that the damages should have been based upon the full injury that may result to the respondent by

reason of the impounding of the waters of the Mokelumne River. ■ This is further shown by subdivision "B", of the judgment, which reads: "(B) To store in said Pardee Reservoir as storage space and water may be available, not to exceed an additional 317,000 acre feet per annum from the Mokelumne River for power purposes, and to use for the generation of hydro-electric power at the base of said Pardee Dam 750 cubic feet per second of the water flowing in said river (whether said water is released from upper storage or otherwise), and to supplement said flow when necessary from water so stored for power purposes and from waters stored in said Pardee Reservoir and not required for municipal purposes; such water used for the generation of hydro-electric power at the base of said Pardee Dam to be returned to the bed of the Mokelumne River above the lands of the defendants." That subdivision shows that only such waters are to be used for power purposes as are not required for "municipal purposes". This language, of course, includes all domestic uses, and thus shows that the trial court did not adopt the true measure of damages, that is the full damages that may be inflicted upon the appellants herein.

Again, the whole theory of the respondents storing water for power purposes rests upon there being water available for storage and use for power purposes. If there is no water available for storage for power purposes, then and in that event the domestic uses for which the waters are primarily impounded by the respondent would completely destroy respondent's property as a reservoir and power site. From which the deduction necessarily follows that there should either be a definite ascertainment and fixing of the quantity of water to be discharged, or an allowance of damages based upon the privilege of the respondent to absolutely discharge no water, as the domestic uses of the respondent would be, and are superior to uses for merely power purposes.

In this particular we may call attention to the record which discloses that neither the appellants nor the respondent introduced testimony which would enable the court to make correct findings and properly assess the damages. ■ The testimony of the appellants' witnesses as to damages, estimated the cost of appellants' project, and then the sale of energy developed by the project. A quotation from the

answer of one of the witnesses will suffice as an illustration of the basis adopted by all of them, to wit: "I capitalized the values that were there. I arrived at this value by assuming that the plant would cost $363,000.00, and that the sale output of energy would be at the rate of $4\frac{1}{2}$ mills per kilowatt, and then capitalized this net profit at 8 per cent, and the sum which invested at 8 per cent would yield the amount of net profit, fixed the market value." We have paraphrased the witnesses' answer slightly in order to shorten the same. That this basis of fixing the damages is incorrect is a settled law of this state. (*City of Stockton* v. *Vote,* 76 Cal. App. 369 [244 Pac. 609]; *East Bay Municipal Utility Dist.* v. *Kieffer,* 99 Cal. App. 240 [278 Pac. 476, 279 Pac. 178], and authorities cited in these cases.)

On the part of the respondent and the theory adopted by the court as we have stated, all the witnesses on the subject of damages assumed first that the respondent would so use its power plant as to furnish a more adequate supply and a better flow of water by reason of its regulation for the uses and purposes of the appellants, than would be the case if the waters of the stream were allowed to flow as in a state of nature. Some of the witnesses based their estimate of damages by taking into consideration a five-year contract which existed between the district and the Great Western Power Company. The testimony of these witnesses is too long to set forth herein, but two questions and answers illustrate the whole theory upon which the court fixed its damages. (Question propounded to Mr. Cone, witness for the respondent): "Q. So that any water that flowed down, and was a benefit to that property, as a means of power development, would depend entirely upon the will of the East Bay District in releasing it, except in cases where the reservoirs were full and it flowed over them? A. Yes. Q. Is it fair to say then that your design of this project was based upon the assumption that you need not give any consideration to the riparian rights of owners of this tract, of which you have spoken, except as you happen to release it through your own power plant? A. No, that is not a fair statement. Q. What is a correct statement? A. A correct statement is that we would have to make such releases as were determined as their right to have made. We did not expect to override the law, or their rights, or anything of that kind."

The vice of the finding and the judgment is in effect that there was no determination of such releases as the witness assumed, that the appellants had a legal right to have made. This runs through all the testimony of the witnesses for the respondent relating to the subject of damages. Their testimony may be summarized as follows: The witnesses for the East Bay District gave it as their opinion that a river regulated under such schedules as might be adopted by the district, would furnish a better basis for the operation of the appellants' plant than would or could be furnished by the natural flow of the stream, leaving the quantity of water released all the while subject to the determination of the officials of the district, and as we have pointed out, under certain conditions, their absolute discontinuance.

In considering the question of damages it must also be borne in mind that the trial court found that the premises involved in this action were and are suitable for reservoir and power purposes. This finding is based upon conflicting evidence, and therefore must be accepted by us as true. The law seems to be quite uniform that in eminent domain proceedings the damages must be assessed once and for all, and must include all the damages that might be inflicted by the condemning party.

In the case of *Crane* v. *Harrison,* 40 Idaho, 229 [38 A. L. R. 15, 232 Pac. 578, 580], we find the law thus stated: "Damages must be assessed once and for all time, and should be based upon the most injurious use to which the condemnor may lawfully put the property." This is the holding of the court in the case of *Idaho Western R. R. Co.* v. *Columbia Conference,* 20 Idaho, 568 [38 L. R. A. (N. S.) 497, 119 Pac. 60]. The opinion in the Crane case continues: "If this is a correct statement of the rule at the time the municipality required the right of way for street purposes, appellant or his predecessor was given damages once and for all time, based upon the most injurious use of the land reasonably possible to which the City might lawfully put it."

To the same effect is the case of *Farmers Reservoir & Irr. Co.* v. *Cooper,* 54 Colo. 402 [130 Pac. 1004], where it is said in substance that all damages, present and prospective, which are the necessary or reasonable incident of taking

property, are recoverable in one action, save and except that anticipated negligence or torts are not included.

In the case of *Cleveland C. C. & St. Louis Ry. Co.* v. *Hadley,* 179 Ind. 429 [45 L. R. A. (N. S.) 796, 101 N. E. 473], we find the following statement supported by a long list of cases: "The general rule in condemnation proceedings is that all damages, present or prospective, that are the natural or reasonable incident of the improvement to be made or work to be constructed, not including such as may arise from negligence or unskillfulness or wrongful act of those engaged in the work, must be assessed. Damages are assessed once and for all, and the future necessities as well as the present needs of the condemnor are to be taken into consideration."

To the same effect is the case of *Brack* v. *Mayor and City of Baltimore,* 125 Md. 378 [Ann. Cas. 1916E, 880, 93 Atl. 994], where it is further in the opinion set forth that mere promises on the part of the condemnor cannot be considered.

In the case of *Louisville etc. Ry. Co.* v. *Western Union Tel. Co.,* 184 Ind. 531 [Ann. Cas. 1917C, 628, 111 N. E. 802], where it was sought to make a limited appropriation and to have the damages assessed upon a limited appropriation, the court held that mere stipulations contained in the complaint were promissory in their character, and did not constitute any binding obligation upon the condemnor, and therefore did not furnish a true basis for estimating damages. In the note to this case, as reported in Ann. Cas., *supra,* appears the following: "Mere unaccepted promissory stipulations of a condemnor of property are distinguished from unappropriated rights reserved to the owner of a fee. The holding is that whatever rights are sought to be appropriated by eminent domain must be taken absolutely and unconditionally, and that unaccepted promissory stipulations cannot affect either the character or extent of the appropriation or the amount of damages to be awarded." (Citing a number of cases.) A distinction is drawn between an appropriation subject to certain rights of the land owner, excepted from the appropriation, and an attempt to impose unaccepted promissory stipulations or proposed agreements by the condemning party or undertakings to be performed after the appropriation, and which are not binding upon the condemning party. These cases hold in effect that if the

stipulation or agreement as to the rights that are left unaffected, and likewise, as in this case, releases of water should be made, and such stipulations and agreements are entered into the judgment, then and in that event the damages may be lessened in conformity with the agreement.

The rules which we have just stated are set forth in 20 C. J., beginning on page 765, where unaccepted promises are held insufficient as a diminution of damages (citing a number of cases), and then it is further said: "The probability that the appropriator will not exercise, or the fact that there is no present intention of exercising to the full extent the rights acquired, should not be considered in reduction of damages where there is nothing to prevent a full exercise of such rights, since the presumption is that the appropriator will exercise his rights and use and enjoy the property taken to the full extent." (See, also, the case of *Sternes* v. *Sutter-Butte Canal Co.*, 61 Cal. App. 747 [216 Pac. 66], where it was held that damages must be assessed once and for all.)

The following cases cited by appellants support the rules of law which we have just set forth: *Hamor* v. *Bar-Harbor Water Co.*, 92 Me. 364 [42 Atl. 790]. (In the opinion in this case a number of other cases are cited to the same effect.) (*Ingraham* v. *Camden Water Co.*, 82 Me. 335 [19 Atl. 861]; *Howe* v. *Inhabitants of Weymouth*, 148 Mass. 605 [20 N. E. 316]; *Denver* v. *Denver Union Water Co.*, 246 U. S. 178 [62 L. Ed. 649, 38 Sup. Ct. Rep. 278]; *Mills* v. *Inhabitants of Randolph*, 157 Mass. 345 [32 N. E. 153]; *Flagg* v. *Town of Concord*, 222 Mass. 569 [111 N. E. 369]. In this case a large number of authorities are cited.)

That the trial court erred in the fixing of damages and that the true measure of ascertaining the same was not adopted, appears to us clearly established from the foregoing. The respondent makes the point that under the cases of *Chester* v. *Carmichael*, 187 Cal. 287 [201 Pac. 925], and *Mahoney* v. *City and County of San Francisco*, 201 Cal. 248 [257 Pac. 49], and authorities there cited, that the deed of the Colorado Power Company to the City of Lodi is void, but from what we have said it does not appear necessary to determine this question. Nor is it necessary to express any opinion as to the validity or invalidity of section XI of the

Water Power Act, wherein the legislature purports to abrogate riparian rights on account of nonuser.

Other questions have been tendered and considered, but not being such as to affect the decision herein, are not mentioned in detail. ▮ We may add, however, that we find nothing in the case which would warrant the application of the apportionment provisions contained in subdivision 4 of section 1240 of the Code of Civil Procedure.

As a conclusion from what we have said, the judgment of the trial court awarding to the respondent, condemnation of the riparian rights of the appellants, is affirmed, and the judgment of the trial court fixing and assessing damages is reversed, and the cause remanded to the trial court to proceed and assess damages awarding the maximum damages that can or may result to the appellants' property, unless the respondent consents to the amending of the findings and the entry of a decree definitely fixing, as near as may be, the quantity of water to be released from the Pardee Dam, irrespective of whether the respondent may, or may not be operating its power plant, and in that event, damages to the appellants may be fixed in such nominal sum as the trial court may determine to be just. And it is so ordered.

Appellants are awarded their costs.

Preston, P. J., and Thompson (R. L.), J., concurred.

A petition for a rehearing of this cause was denied by the District Court of Appeal on March 16, 1932, and applications by appellants and respondent to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on April 15, 1932.