STATE of Minnesota, by Warren SPANNAUS, its Attorney General, Petitioner, Appellant,

v.

NORTHWEST AIRLINES, INC., et al., Respondents.

No. CX-87-143.

Court of Appeals of Minnesota.

Sept. 29, 1987.

Review Denied Nov. 24, 1987.

Hubert H. Humphrey, III, Atty. Gen., John C. Jeppesen, Sp. Asst. Atty. Gen., St. Paul, for appellant.

Richard J. Gunn, Minneapolis, for respondents.

Heard, considered, and decided by the court en banc, consisting of POPOVICH, C.J., and PARKER, FOLEY, WOZNIAK, SEDGWICK, LANSING, HUSPENI, FORSBERG, LESLIE, NIERENGARTEN, RANDALL, CRIPPEN, NORTON, MULALLY* and LOMMEN*, JJ.

## OPINION

PARKER, Judge.

In a trial de novo following a condemnation award, the trial court excluded evidence of access to the frontage road from the remainder property on the basis that right of access to the remainder property was questionable. The State of Minnesota appeals on the basis that right of access was sufficiently certain so that the exclusion of the evidence denied the state a fair trial. We reverse and remand for a new trial.

## FACTS

The State of Minnesota began this condemnation proceeding in 1981, pursuant to plans for improving the frontage road which services the south side of Interstate 494 in Bloomington, Minnesota. At that time, the frontage road ran east and west along the northern boundary of property owned by respondent Northwest Airlines, Inc. (NWA). NWA at that time had direct access to the frontage road from its property.

The state condemnation proceeding took 3.14 acres of NWA's property, removing all existing access to the frontage road. The state planned to close the existing frontage road and build a new one ending in a cul-de-sac about 65 feet west of the border of NWA's property (see Figure 1). The state acquired all of NWA's access rights to the existing frontage road, but NWA retained a right of access to the proposed frontage road and cul-de-sac across 65 feet of state-owned right of way. The retained access begins at the northwestern corner of the remainder property and runs 140 feet south along the western boundary of NWA's property.

* Acting as judges of the Court of Appeals by appointment pursuant to Minn. Const. art. 6, § 2.

NORTHWEST AIRLINES INC
PROPERTY
"AFTER" THE TAKING

LONG

MEADOW

LAKE

(Figure 1.)

Throughout the condemnation proceedings, the parties discussed the state's plan for the new frontage road in relation to the potential construction of an entrance and driveway from the cul-de-sac to the remainder property. Their discussion included the problems associated with constructing the entrance across the drainage draw that runs through the 65 feet of state-owned land. In designing the cul-de-sac, the state took into account NWA's intent to build

itself an entrance to the cul-de-sac. However, NWA's intent to build was tentative, depending on completion of its comprehensive plans for developing the remainder property.

On August 9, 1982, the court-appointed condemnation commissioners awarded NWA $1,581,730 to compensate for the taking of its property. The award apportioned $765,000 for the value of the land acquired and $816,730 for damages to the remainder. The commission conditioned the award on the state's granting NWA a permit to build an entrance to the cul-de-sac and on NWA bearing the cost of constructing the entrance. Both parties appealed the award to the district court for a trial de novo of damages for the taking. By statute, the de novo review rendered the commission's award moot. *See* Minn.Stat. § 117.175, subd. 1 (1986). However, the date of the commission's award established the date on which damages for the taking must be assessed in the district court trial. *State v. Pahl,* 257 Minn. 177, 182, 100 N.W.2d 724, 728 (1960).

Before trial, NWA brought a motion to exclude any evidence of the right of access. The trial court granted the motion in an order dated June 5, 1985, based on its conclusion that the right of access was not certain on the date of taking. On September 19, 1985, on the state's motion, the trial court vacated this order and ordered that evidence of access provided by the frontage road and cul-de-sac be admitted. The court based its reversal on *City of Chisago City v. Holt,* 360 N.W.2d 390 (Minn.Ct.App. 1985). However, on December 20, 1985, the trial court reinstated its original order excluding the evidence. The December 20, 1985, order was orally reaffirmed on September 15, 1986, by the trial judge assigned to hear the case after the retirement of the original judge. The state, therefore, introduced no evidence of damages for the taking or the value of the remainder of the property.

A jury heard the case in December 1986 and awarded NWA $3,500,000, with $720,000 apportioned for the value of the land taken and $2,780,000 for damages to the remainder property. Judgment was stayed pending this appeal, which the state brought from the trial court's order denying a new trial.

## ISSUE

Was it error to exclude evidence of the value of the access to the remainder property?

## ANALYSIS

A motion for a new trial may be granted when an irregularity in the proceedings, including the erroneous exclusion of evidence, deprives the moving party of a fair trial. *See* Minn.R.Civ.P. 59.01(1). A motion for a new trial, however, should be granted "cautiously and sparingly and only in the furtherance of substantial justice." *Leuba v. Bailey,* 251 Minn. 193, 207–08, 88 N.W.2d 73, 83 (1957). Furthermore, the trial court has broad discretion in deciding whether a new trial is required, and its decision will not be reversed unless there was a clear abuse of discretion. *See Connolly v. Nicollet Hotel,* 258 Minn. 405, 407, 104 N.W.2d 721, 724 (1960).

Relying on *City of St. Louis Park v. Almor Co.,* 313 N.W.2d 606 (Minn.1981), NWA argues that the trial court properly excluded evidence of NWA's access to the remaining property because such access was not certain at the time of the condemnation proceedings. In *Almor,* pursuant to plans to upgrade Louisiana Avenue, the City of St. Louis Park acquired a strip of land along the western border of plaintiff's property through eminent domain, taking all right of access. *Id.* at 607. At trial the owners claimed damages for landlocking the property based on the total taking of access. *Id.* The trial court allowed the condemnor to introduce evidence of the possibility of alternative access, specifically, that the city could give an easement to a public road across an intervening railroad right of way and over city-owned property to reach the street. On appeal the Minnesota Supreme Court reversed, holding that a factfinder cannot consider evidence of access to remaining property unless such

access existed or was certain at the time of the taking. *See id.* at 608–609.

The facts of the present case are different from those of *Almor*, and that case is inapposite. This is not a landlocked property case. Unlike *Almor*, here the state did not take all access to the property. NWA retained a right of access as an abutting owner to the frontage road and cul-de-sac at the northwest corner of the retained property. The condemnation petition and commission's order clearly stated that "the abutting owner shall retain the right of access to an outer lane" of the frontage road.

■ NWA argues that it has not retained a right of access because it is not an abutting owner in that the cul-de-sac is built 65 feet inside the right of way on state-owned property. An abutting owner under Minnesota statutes, however, is one whose property abuts the right of way, whether or not the edge of the traveled portion of the highway is also the right-of-way line. *See, e.g., State v. Gannons, Inc.*, 275 Minn. 14, 16, 145 N.W.2d 321, 324 (1966) (abutting property on street with 200–foot–wide right of way and traveled surface 85 feet wide); *Hendrickson v. State*, 267 Minn. 436, 437, 127 N.W.2d 165, 167 (1964) (property abutted right of way but was located 85 feet from traveled portion of highway). The remainder property need not physically touch the proposed frontage road; NWA is an abutting owner because the remainder property borders the state's right of way.

■ According to Minnesota statutes, all abutting property owners have the right of access to a new right of way unless the right is specifically taken. The statute states that

> [w]hen an outer lane is constructed, the abutting owners shall have access to the outer lane unless the petition and notice in condemnation * * * clearly specifies that the right of access to the outer lane has been acquired.

Minn.Stat. § 160.08, subd. 5 (1986). Because NWA is an abutting owner under the statute, the state retained for NWA a valuable right of access. In fact, it appears that the state's condemnation petition went beyond the statute's requirements and specifically provided that NWA would retain a right of access to the frontage road and cul-de-sac.

■ NWA makes much of the fact that the entrance has not yet been constructed and that it must cross a "deep drainage ravine" running between NWA's property and the frontage road and cul-de-sac. NWA confuses certainty of access with difficulty in building the entrance itself. Failure to construct an entrance has no impact on the certainty of an abutting owner's easement of access. A property owner acquires vested access rights immediately upon the dedication and acceptance of a street for public use. The street or highway need not be physically cleared, regulated, or in any way improved before an abutting owner's right of access becomes certain. The access easement comes into being the moment a street or highway is legally designated by a road authority for highway purposes. *See Stom v. City of Council Bluffs*, 189 N.W.2d 522, 527–28 (Iowa 1971); *Small v. State Roads Commission*, 246 Md. 646, 229 A.2d 408, 411–12 (1967); 3 J. Sackman, Nichols on Eminent Domain § 10.221[5], at 388 (1985). Accordingly, the certainty of NWA's right to access is not dependent upon the construction.

NWA not only has a right of access to the retained property, but also has a statutory right to have the state build an entrance from that access to the frontage road. Minn.Stat. § 160.18, subd. 2 (1986) ("Except when the easement of access has been acquired, the road authorities in laying out and constructing a new highway or in relocating or reconstructing an old highway *shall* construct suitable approaches thereto within the limits of the right-of-way where the approaches are reasonably necessary and practicable, so as to provide abutting owners a reasonable means of access to such highway" (emphasis added)). The statute unequivocally provides that the state has the responsibility to build an entrance and provide at least one culvert. Minn.Stat. § 160.18, subds. 1–2 (1986) The

state must also supply the fill for an entrance to NWA's property. *See* Op.Atty. Gen. 642–A–1 (March 23, 1932).

NWA also argues that because the Minnesota Department of Transportation (MnDOT) reserves the right to control safety and design consideration for construction of the entrance, the right to access is made less certain. NWA asserts that the exercise of such regulatory power converts NWA's right of access into a mere "permit," revocable at the state's discretion.

 It has long been recognized in Minnesota that an abutting owner's right to reasonable access to a street or highway is a property right. *Burnquist v. Cook*, 220 Minn. 48, 57, 19 N.W.2d 394, 399 (1945). An abutting property owner does not, however, have a right of access at every point on the street or highway; his right of access is subject to reasonable regulations in the public interest. *See Gibson v. Commissioner of Highways*, 287 Minn. 495, 500, 178 N.W.2d 727, 730 (1970); 3 J. Sackman, Nichols on Eminent Domain § 10.-221[5], at 381 (3rd ed. 1985). Nevertheless, the power to regulate does not include the complete taking of the right of access. *Johnson v. City of Plymouth*, 263 N.W.2d 603, 608 (Minn.1978). While the state may not refuse to permit construction of the entrance to NWA's property, regulation of access and design consonant with traffic conditions and uniform police requirements is a proper exercise of the state's police power and does not affect the certainty of access to NWA's property.

NWA also argues that government agencies other than MnDOT may refuse to approve permits allowing construction of the entrance to the property. While an owner of property subject to condemnation has a duty to exercise reasonable diligence to mitigate damages, *State v. Pahl*, 254 Minn. 349, 357, 95 N.W.2d 85, 91 (1959), NWA has not yet applied for an entrance permit from any government agency to construct the entrance. Consequently, there is no evidence to support the conclusion that these permits will be refused. NWA's argument is based on mere speculation and is without merit.

 As Justice Mitchell noted in *King v. Minneapolis Union Railway Co.*, 32 Minn. 224, 226, 20 N.W. 135, 136 (1884), "any evidence is competent and any fact proper to be considered which legitimately bears upon the question of the marketable value of the property." We hold as a matter of law that NWA, as an abutting owner, has a vested right of access and right to construction of a suitable entrance from its remainder property to the frontage road and cul-de-sac. The trial court erred in refusing to allow the state to show NWA's vested right of access mitigated damages to the remainder property.

### DECISION

The trial court erred in excluding evidence of access, because the state had not acquired all access rights to the remainder property but reserved sufficient access to construct an entrance.

Reversed and remanded for new trial.

POPOVICH, C.J., and CRIPPEN, LESLIE, RANDALL and LOMMEN, JJ., dissented.

WOZNIAK and NIERENGARTEN, JJ., concurred specially.

WOZNIAK, Judge (concurring specially).

I concur in the result of the opinion, but agree with Judge Leslie's legal analysis of our en banc procedure.

NIERENGARTEN, Judge, concurring specially.

I concur with the majority decision because I believe the trial court should have admitted access evidence. However, I also believe Northwest Airlines should be able to introduce evidence of restrictions which will materially affect its use of the property.

CRIPPEN, Judge, dissenting.

Court-appointed commissioners awarded damages in this case on August 9, 1982. Later that month, Northwest Airlines, Inc.

served and filed the notice calling for review of the award by the trial court. Appellant State of Minnesota asked the trial courts to disregard the facts of record and to engage in conjecture, speculation and imagination to wrongfully minimize the landowner's proof of damages. Although unsupported by any evidence, introduced or offered for introduction, appellant suggests that respondent will enjoy alternative access to the remnant of its property not taken, implying that respondent enjoys windfall damages unless the courts assume that the remaining property is not landlocked.

In June 1985, a trial judge rejected the state's attempt to substitute guesswork for evidence in determining respondent's damages. Evidence in the case included the fact that the state did not take respondent's right of access to right-of-way acquired for a new dead-end frontage road. At the time of taking, in August 1982, no access construction had occurred. The state contended access would be built in the future, but it offered no evidence showing the kind of construction that could provide suitable access across a wide, deep ravine running along the end of the new frontage road. In addition, the state offered no evidence that a construction plan, if devised, would meet with approval by the road authority and environmental agencies. Thus, the trial court excluded evidence premised on the assumption that access would be obtained; those "possibilities," the court found, were uncertain.

Following reconsideration of the issue in ensuing months, the trial court reiterated its decision in December 1985. A year later, when the trial proceedings began, a second judge carefully reviewed the issue and decided that the state could not use evidence premised on mere promises in August 1982 that suitable access would be obtained.

This court should affirm the decisions of the trial court. It is improper for the state to use evidence founded on the speculative assumption that respondent will somehow sometime obtain suitable access to its property. We are constrained to agree with the trial court because (1) we cannot distort the facts to fit an imagined picture of injustice, (2) we are not at liberty to overlook matters of law already decided by the supreme court, and (3) we cannot disregard the trial court's discretion on the issue of the case.

Because I am convinced that in August 1982, and even today, it is conjectural to assume that respondent will ever obtain alternate access, I respectfully dissent. This opinion examines six considerations in analysis of the case.

a. Initially, the facts of the case are reviewed, demonstrating the failure of appellant to show what form of suitable access construction is physically feasible.

b. Second, the opinion states the law of certainty on matters of access, as well as bases of that rule which are pertinent to deciding this case.

c. Third, the matter of obstacles to access construction is discussed. Herein is found the core of disagreement with the majority opinion of this court. There it is contended that access construction is a matter of no importance so long as respondent has a legal right of access. Thus, it is further contended that the certainty of access is unaffected by the police power of the state, the state's ultimate authority to withhold the building of access and to disallow construction plans of others. Settled matters of law in Minnesota make these contentions untenable. The approach of the state in this matter led unavoidably to the trial court's conclusion to exclude evidence premised on the "possibility" or the "promise" that alternative access would be obtained. Appellant failed to identify an access construction plan. As a result, it has failed to show that construction will occur; that construction will not be thwarted by public agencies empowered to deny actions that threaten traffic safety or the environment.

d. Fourth, the opinion reviews the law on respondent's duty to mitigate its damages. Appellant has not met its burden to produce evidence showing that respondent could construct access on its remaining property and on the state's right-of-way.

e. Fifth, the opinion refutes the speculative notion that the trial court's ruling in this case gives respondent a compensation windfall.

f. Finally, the opinion addresses the law on the trial court's discretion to decide the issue of this case.

1. THE PHYSICAL FACTS: WHAT THE RECORD SHOWS AND WHAT THE RECORD DOES NOT SHOW

When these condemnation proceedings began in 1981, respondent owned a 56–acre parcel lying north and west of the Minnesota River Valley. The parcel constituted the east half of a quarter section of land, less 24 acres of the river valley on the south end of the parcel. Farm buildings had once been located in the northern part of the property, and there were farm entrances onto West 78th Street, an east-west road located on a right-of-way immediately to the north of the parcel. Since the construction of Interstate Highway 494 some years earlier, 78th Street had served as a frontage road adjoining the larger highway.

In 1981, to accommodate a new ramp adjoining Interstate Highway 494, the state began proceedings to take 3.14 acres from respondent's parcel. The taking involved all of the parcel fronting on West 78th Street and much of the high elevation land included in respondent's property. The taking involved a triangular-shaped piece of land on the north end of the parcel. The boundary of the taking began at the northwest corner of the parcel, went south 295 feet on the west line, and then north-easterly at an angle to meet the north line of the parcel at a point about 875 feet east of the northwest corner.

The state also acquired right-of-way on the parcel lying west of respondent's tract. Here, however, the state took an additional 140 feet of right-of-way to accommodate an east-west frontage road to be constructed along with other highway improvements. Thus, the state owned right-of-way abutting on the north 140 feet of the west boundary to respondent's remnant parcel. The state did not take from respondent its right to ingress and egress along this 140–foot line. The plan did not include frontage road construction up to respondent's property or any taking of respondent's property for further frontage road construction. The frontage road constructed by the state in 1983, a so-called cul-de-sac or dead-end road, terminated at a point 65 feet west of respondent's property.

In sum, the state took all of the existing access to respondent's property. The state asserts, however, that it anticipated respondent would have access by some sort of construction extending the state's frontage road across its right-of-way and easterly to a point on respondent's property where the road would be usable. The state's expectation conflicts with undisputed evidence of record and is unsupported by any evidence received or offered.

To study the state's intentions for access, it is necessary to take a closer look at respondent's property.[1] Most of the property taken by the state is at an elevation above 800 feet. At two points on the southerly edge of the taking there are dips downward of 10 to 25 feet. Almost all of respondent's remnant property is on a slope downward in a southeasterly direction to the river valley. Over 40 acres of the remnant of about 53 acres is in a flood plain at an elevation less than 722 feet.

On the west side of respondent's property there is a ravine which runs along the west boundary line and then in a south-southeasterly direction. Along the ravine, the elevation of the property drops 100 feet over a distance of about 600 feet. Elevation of the ravine is about 790 feet at the northwest corner of the remnant parcel.

1. It is unclear in what form the facts recited here were brought to the attention of the trial judge who first decided the evidentiary issue in the case. Evidently, according to the briefing of one of the parties, the judge viewed the premises before deciding the question. The facts reported here are found in the record of trial evidence. Careful attention has been given to respondent's exhibit 13, a so-called site plan, a drawing to scale of respondent's property at the time of taking, showing exactly the boundaries of the property and its typography.

The state's new frontage road ends at a point where the elevation is about 810 feet, and from that point to the east the elevation of the land dips into the ravine on the westerly edge of respondent's property.

Respondent's remnant property includes less than one acre at an elevation over 800 feet. The nearest part of this high ground, a one-third acre square-shaped piece of land, lies opposite the ravine to the east of the state's dead-ended frontage road, approximately 300 feet away.

Taking into account the remnant of property left for respondent, and the access imagined by the state, two questions are left unanswered. First, it is not apparent what kind of construction is physically feasible to fill or bridge the ravine to suitably accommodate traffic from the state's frontage road to the high ground on the remnant property.

Second, it is unclear what productive use might be made of respondent's remnant parcel. The evidence indicates that the original parcel was most usable as a commercial office site. Respondent offered evidence that without access, the parcel was "an unbuildable tract of land," and that its best use would be as part of the wildlife refuge which surrounds it. It is not evident what use might be made of the parcel if access construction occurs across the ravine and up to the remaining high elevation property. Without knowing what use might be made of the property, it is even more difficult to speculate on the access construction plan that would be feasible.

The state offered no evidence regarding the kind of construction that would be feasible for respondent's remnant parcel, or the use that might be made of that property. The record offers us nothing but speculation regarding the ultimate fact of access construction.

Appellant's offer of proof was in two parts. First, they proposed to demonstrate to the jury the completed construction of the frontage road lying west of respondent's property. It was evidently clear to the trial court and the parties, including appellant, that receipt of this evidence would permit the jury to speculate whether access might somehow be built to take advantage of the frontage road. Understandably, two trial judges were unwilling to let the jury hear evidence on potential access that would leave the jury guessing about possibilities it might ever be constructed. In addition, appellant proposed the testimony of an appraiser who would say that respondent's total damages would be $785,000 if access were provided from the frontage road. Nothing more was revealed as to the prospective testimony of the state's appraiser. While we might reasonably conclude that the appraiser would address the question of use of the remnant property, the available evidence in that regard was not revealed for the record. There is no suggestion whatsoever in the record that appellant's appraiser would address the question of suitable and feasible access construction.

Thus, appellant's efforts to deal with respondent's access needs are wholly deficient. All existing access was taken. Appellant proposes that alternative access can exist at a point where there is a major natural barrier to an uncomplicated construction of access. There is no evidence that appellant did anything to ensure that appropriate access would be given. A frontage road was dead-ended at the point where construction complications would begin. No plan was proposed to take property for state construction of suitable access for respondent. There is no evidence the state made any suggestions as to the kind of access construction that might occur, or that it reached any conclusions on that subject. In these circumstances, it is wholly understandable that damages were finally determined by treating the remnant parcel as landlocked.

## 2. THE LAW OF THE CASE: THE RULE OF CERTAINTY AND ITS ROOTS

The state's cul-de-sac ended 65 feet west of respondent's remaining land. At trial and on appeal the parties have dwelled on the question whether there was an adequate prospect of access construction across the state's right-of-way. The trial

court refused the state's proposed evidence on this access alternative because it concluded that the prospect of access construction on the right-of-way was uncertain. *See City of St. Louis Park v. Almor Co.,* 313 N.W.2d 606, 610 (Minn.1981) (admission of access evidence is fundamental error where alternative access was not constructed and future access was uncertain at the time of a taking).

Underlying the rule of certainty is the proposition, recognized in Minnesota for over 100 years, that damages in eminent domain proceedings are assessed as of the date of taking, this being the date of the court commissioners' original award. *Almor,* 313 N.W.2d at 609–10. *See Housing and Redevelopment Authority v. Greenman,* 255 Minn. 396, 410, 96 N.W.2d 673, 683 (1959) ("The fundamental doctrine that private property cannot be taken for public use without just compensation requires that compensation shall be determined as of the time of taking."). *See also The Winona & St. Peter Railroad Co. v. Denman,* 10 Minn. (Gil.) 208, 223 (1879). The rights of the landowner depend upon determination of a fixed amount of damages at the time of the initial award. *See In re Milwaukee Electric Railway & Light Co. v. Becker,* 182 Wis. 182, 187, 196 N.W. 575, 577 (1923) ("It is clear that, when property is taken under the right of eminent domain, the damages to be awarded must be founded upon a definite and fixed basis, and that they must be determined as of the time of condemnation. The owner is entitled, not only to compensation, but to the right to have the same fixed, determined, and paid at the earliest time reasonably possible."). Thus, the fixing of compensation is to be done once and for all, eliminating the owner's need to pursue further litigation. *Id. See State v. Hayden Miller Co.,* 263 Minn. 29, 33, 116 N.W.2d 535, 538 (1962) ("the award shall be a single award for the entire damage for the land actually taken, including as well the harm resulting to the remainder because of the taking."); *East Bay Municipal Utility District v. City of Lodi,* 120 Cal.App. 740, 746, 8 P.2d 532, 541–42 (1932) ("the damages must be assessed once and for all, and must include

all the dangers that might be inflicted by the condemning party.").

Based on these precepts, it follows that compensation is determined with regard to the facts that are certain at the time of taking, independent of less-than-certain prospects the landowner's damages will be ameliorated by some future action of the condemning authority. *Almor,* 313 N.W.2d at 608–09 (the measure of compensation is unaffected by intentions of the condemning authority for future action) (citing 26 Am.Jur.2d *Eminent Domain,* § 154 (1966)); *see also In re Milwaukee Railway & Light Co.,* 182 Wis. at 187, 196 N.W. at 577 (the measure of compensation is "unrestricted and unhampered by what may or may not be done by petitioners with respect to their offers in the future.").

*Almor* discussed some of "the fine distinctions on which a finding of 'certain' access can be based," including whether the state had acquired the property over which the access would be constructed, whether the "giving of access" was certain, and whether the access-granting was an integral part of the purpose for which the property was condemned. *See Almor,* 313 N.W.2d at 609. Of these facts, the parties agree only that the "certainty" of acquisition of the property over which the access might be built favors the state, as the state already owns the intervening property. It is arguable whether access for respondent was "integral" to the state's taking; the frontage road was constructed for various access purposes, but no planning occurred to make certain that access would be enjoyed by respondent. This opinion is premised on the conclusion that the evidence shows no certain "giving of access," and that this fact, whether or not access was integral to the state's plan, makes access evidence inadmissible under *Almor.*

The *Almor* rule of law is complemented by the holding that evidence on future events is inadmissible unless the occurrence of the event is shown to be reasonably probable. *Minneapolis-St. Paul Sanitary District v. Fitzpatrick,* 201 Minn. 442, 450, 277 N.W. 394, 399 (1937) (citing *Olson v. United States,* 292 U.S. 246, 257,

54 S.Ct. 704, 709, 78 L.Ed. 1236 (1934)). The rule of certainty, based on principles of compensation for a taking, parallels, but is more precise than the rule of evidence on speculation.

### 3. LEGAL BARRIERS TO ACCESS

The state contends there was a certain "giving of access" in this case. Appellant argues they gave alternative access; that they took a right-of-way adjoining the west edge of respondent's remaining property, and did not legally limit respondent's access onto that right-of-way.

#### a. *Access vs. Right of Access*

When not taken by the road authority, a landowner in Minnesota has the "right of reasonable, suitable, and convenient access" between his property and an abutting public highway. *State v. Prow's Motel, Inc.*, 285 Minn. 1, 4, 171 N.W.2d 83, 85 (1969). *See Hendrickson v. State*, 267 Minn. 436, 439, 127 N.W.2d 165, 169 (1964). In addition, it is pointed out that the state has an obligation when constructing a new highway to build suitable approaches on its right-of-way, "where the approaches are reasonably necessary and practicable, so as to provide abutting owners a reasonable means of access to such highway." Minn. Stat. § 160.18, subd. 2 (1986). Also, any owner with property abutting on an existing highway has a right of access to the road "subject to regulation by and permit from the road authority as is necessary to prevent interference with the construction, maintenance and safe use of the highway and its appurtenances and the public use thereof." Minn.Stat. § 160.18, subd. 3. *See also* Minn.Stat. § 160.08, subds. 5 and 6 (right of access to frontage road).

Does the right of access, enhanced by the state's conditional obligation to construct suitable access, constitute a certain "giving of access?" In the circumstances of this case, the trial judges did not think so, and those judgments were sound.

It is evident on the face of the statutes that the state has the final authority to determine whether or not access construction will occur. No doubt the state's authority is the proper exercise of police powers, as the majority opinion states. No doubt, also, the state must be reasonable in making a judgment about access or proposals. Still, uncertainty prevails so long as the state does not construct access or commit itself firmly to do so. *See Kravec v. State*, 40 N.Y.2d 1060, 1061, 392 N.Y.S.2d 246, 247, 360 N.E.2d 925, 926 (1976) (an owner's right to cross a drainage easement, so long as it does not interfere with the easement, not a certain right). *See also Wolfe v. State*, 22 N.Y.2d 292, 292 N.Y.S.2d 635, 239 N.E.2d 517 (1968) (drainage easement for uses which are found not to interfere with easement rights). Here the statutes clearly establish the state's right to deny a proposal for access construction. Under section 160.18, subdivision 2, the state must determine whether a proposal is "necessary and practicable." Under subdivision 3 of that section, the state must determine whether a proposal interferes with its highway usage.

The significance of the state's ultimate authority over access construction is more evident when we reconsider the underlying premises for the rule of law on certainty. As noted before, the landowner is entitled to a final determination of its damages, an award to compensate the owner "once and for all." *East Bay Municipal Utility District*, 120 Cal.App. at 762, 8 P.2d at 542. In this case, the state has not constructed access across its right-of-way to the remaining property of the respondent, and it has not committed itself to do so. It has not made an access construction proposal that takes into account the natural barrier of a deep, wide ravine. It has not unconditionally waived its rights to object to construction of access proposed by the landowner. Thus, it is evident that litigation can be anticipated in the event the state fails to accommodate the construction of access. The law does not require the landowner to wait for further action of the condemning authority and to sue them in the event further damage is done. *See In re Milwaukee Electric Railway & Light Co.*, 182 Wis. at 187, 196 N.W. at 577.

The state contends that its engineer has given assurances that a construction permit will be granted when respondent requests the permit. It is clear, however, that the engineer's assurances are conditional. The same engineer, in a letter in this case written shortly before the taking, observed that access construction *"will be on a permit basis, with the Minnesota Department of Transportation reserving its control, safety and design considerations for the entrance."* (Emphasis added). Counsel for the state contended before the trial court:

> There is absolutely no question that petitioner is required to grant an entrance permit when applied for *unless it then determines to acquire all access rights and pay damages for landlocking the property. In such a case the damages for the loss of access to the frontage road and cul de sac would then be determined as a separate matter.*

(Emphasis added). Although the state clearly appreciates the risk here of a second claim for compensation, they fail to recognize that this is precisely the occurrence to be avoided in order to protect a landowner's fundamental right for compensation.

The risk of further litigation is also evident by looking at the statutory obligation of the state and the evidence of events in this case. The state has certain obligations when "laying out and constructing a new highway or in relocating or reconstructing an old highway." Minn.Stat. § 160.18, subd. 2 (1986). The other statutes on access deal with rights of access after construction. Minn.Stat. § 160.08, subds. 3, 5 and 6. It is evident here that the state did nothing to satisfy its obligations under Minn.Stat. § 160.18, subd. 2. It did not construct access or plan for construction of access in laying out and constructing new improvements of Interstate Highway 494. It is abundantly evident, if it is assumed that compensation in this case were measured without regard for lost access, that there would already be cause for new litigation based on a failure of the state to meet its statutory duty to construct an appropriate approach.

Appellant's proposed alternate access, a right of access at a point east of its new dead-end road, is not certain access. Where construction of access is so evidently uncertain, the right of access is meaningless.

Cases can be imagined where it is fair to assume that the right of access will lead to the construction of access. The most evident example is construction in the form of a load of gravel over a culvert. Here, however, a different case is evident. Moreover, if construction has "no impact" on the certainty of access, as the majority opinion suggests, imagination shows us an absurd result. Such would be the case, for example, where the right of access was left intact on a boundary adjoining a river. In the instant case, undisputed evidence makes it apparent that access is uncertain and a right of access does not change that fact.

### b. Demands of Other Government Agencies

It is also significant that the proposed access construction must somehow cross over a deep ravine that drains into the flood plain of the Minnesota River. The state obtained affidavits from various agencies that might be affected by construction of this kind. For example, an agent of the City of Bloomington observed there was "no reason to presume" that the access construction would conflict with city ordinances. An agent of the Department of Natural Resources stated that the department would not be interested in construction at an elevation more than 60 feet above the Minnesota River and a nearby lake. All of these statements are meaningless, because they are without reference to any specific or even general plan of access construction. Significantly, the president of an area watershed board observed that the board had no jurisdiction with respect to ingress and egress from respondent's property, *"except the construction of the same as it relates to the quality of the flood plains and floodway."* It is by no means certain that the landowner can expect to proceed with an access construction

plan without being thwarted by one of several agencies in addition to the Minnesota Department of Transportation.

### c. *Comparable Cases*

Appellant argues that the landowner's parcel in *Almor* was more evidently landlocked than the remaining parcel owned by respondent. If that observation is accurate, and it may not be, it takes nothing from the strength of the rule of law announced in *Almor.* It is also significant to note that the preceding analysis of this case coincides with decisions in other states on related issues.

So for example, in *Wolfe,* cited in *Almor,* the appellate court affirmed a decision to exclude evidence on the bridging of a drainage ditch where the right to cross the state's right-of-way remained subject to its determination of noninterference with the drainage easement. *Wolfe,* 22 N.Y.2d at 295–96, 292, 292. N.Y.S.2d at 638–39, 239 N.E.2d 519–20. *See Almor,* 313 N.W.2d at 609. In *Hodges v. Jacksonville Transportation Authority,* 353 So.2d 1211, 1214 (Fla.Ct.App.1977), also cited in *Almor,* the court found it erroneous to hear evidence of an appraisal based on the construction of a road where an engineer said that the road would be furnished but where there was no evidence of an enforceable agreement to build the road. *See Almor,* 313 N.W.2d at 609. In contrast, numerous cases indicate that the certainty of access is founded upon the actual occurrence of construction at least up to the boundary line of the landowner's remaining parcel. *Missouri Pacific Railroad Co. v. State,* 469 S.W.2d 817 (Tex.Civ.App.1971) (discussed in *Almor,* 313 N.W.2d at 609). *See also* cases discussed in Annotation, *Compensation for, or Extent of Rights Acquired by, Taking of Land, as Affected by Condemnor's Promissory Statements as to the Character of Use or Undertakings to be Performed by It,* 7 A.L.R.2d 364 (1949).

Neither Minnesota decisions nor cases decided by states similarly stating the law of eminent domain have set any precedents for the proposition that the conditional right of access is certain evidence of actual enjoyment of access, either in circumstances like those here or even in cases of less complicated access. Likewise, no such decisions have been identified to support the notion that the legal burden of government agencies to deal reasonably in the exercise of their authority serves to make certain that they will approve a landowner's proposal for access construction or other steps to upgrade the value of its property.

### d. *Respondent's Obligations*

The state contends that the landowner cannot object to speculative evidence on the possibilities of access in light of the fact that the owner has never sought a permit for access from the state. It is the landowner, appellant argues, who is speculating it will not get a permit. The majority opinion agrees.

This argument leads to a later discussion in this opinion on the owner's obligation to avoid damages. Before dealing with that topic, however, an essential fallacy in the state's contentions is recorded.

The obligation of appellant on the date of the taking was not conditioned upon an application for a permit. The state had an absolute obligation in connection with new construction of roads to build an appropriate approach for the landowner. Minn. Stat. § 160.18, subd. 2. Construction by permit, which is construction proposed by a landowner, applies in situations where roads have already been constructed. *Id.* §§ 160.08, subds. 5 and 6 and 160.18, subd. 3. In fact, on the date of taking, August 9, 1982, there had been no construction giving rise to the occasion for seeking a permit.

In addition, the law recognizes that the condemnor, not the landowner, determines the scope of a taking. *See Leber v. Minneapolis & Northwestern Railway Co.,* 29 Minn. 256, 260, 13 N.W. 31, 32 (1882) (the silence of the landowner does not constitute a waiver or consent to actions of the taking authority).

### e. *The Commissioners' Award*

Appellant contends that the certainty of future access for respondent was settled

by the fact that respondent presented evidence to the court commissioners on the cost of constructing access from the state's frontage road and across the ravine on respondent's property. The record of proceedings before the commissioners is not a part of the trial court's record. One of appellant's engineers reported to the trial court by affidavit that respondent's witnesses before the commissioners testified on the "costs" of access construction. We do not know if this testimony identified a specific access construction plan. In fact, the same affiant states that respondent's witnesses testified that "the specific location and design" of access construction could not be determined until more detailed plans for development of the property had been completed.

In addition, the positions of the parties in proceedings before the commissioners do not limit the presentation of evidence upon judicial review, which is conducted de novo. Minn.Stat. § 117.175, subd. 1 (1986).

It is noted that the commissioners "may reserve to the owner a right of way or other privilege in or over the land taken, or attach reasonable conditions to such taking in addition to the damages given." Minn. Stat. § 117.085. Assuming that this provision permits commissioners to determine the scope of taking, which would affect the determination of damages on review, it should be noted that the commissioners here did not attach conditions to the state's taking. The commissioners determined damages on the assumption that the state would allow the owner to build an entrance from the remaining property to the end of the frontage road. Although the commissioners labeled their assumption the "basis and condition" for its damage determination, they did not exercise their statutory powers to demand benefits from the landowner. The state does not claim that the commissioners' created a binding obligation to the state.

### 4. RESPONDENT'S OBLIGATIONS: THE LAW ON AVOIDABLE CONSEQUENCES

Appellant contends that respondent would have been given access if it had only requested it. As an initial consideration, the over-simplification involved in this argument must be kept in mind; what is at issue is not the application for a permit, but the formulation of an access construction plan, taking into account a determination of the best use of the remaining property.

The assertion that respondent could mitigate damages gives rise to a new and helpful perspective on the issue of this case. The uncertainty surrounding construction of access to respondent's property goes considerably beyond the issue of construction over the state right-of-way. Although the trial court did not address the question, it is evident that any access construction that would benefit respondent's property would also have to pass over nearly 250 feet of ravine located on respondent's property. If there is no evidence showing that respondent could and should complete construction on its own property, this further supports the trial court's determination to exclude speculation on access.

Minnesota follows the rule of "avoidable consequences" for landowners in condemnation proceedings. *State v. Pahl,* 254 Minn. 349, 357, 95 N.W.2d 85, 91 (1959). The owner must use "reasonable diligence to minimize his damages." *Id.* (quoting *Lanesboro Produce & Hatchery Co. v. Forthun,* 218 Minn. 377, 381, 16 N.W.2d 326, 326 (1944)). This rule of law bears on the obligation of respondent to make access improvements on its own property. It also has to do with the owner's obligation toward construction on the state's right-of-way, and on the state's argument that respondent has bootstrapped itself into a larger claim of damages by refraining from constructing or seeking a permit to construct access to do so.

The condemning authority has the burden to prove the landowner's opportunity to mitigate its damages. *Lanesboro,* 218 Minn. at 381, 16 N.W.2d at 328. When the state attempts to prove that a landowner has failed to exercise reasonable diligence to minimize its damages, it faces the same limits encountered when it attempts to prove the availability of access. The court

cannot accept speculative evidence as to what the landowner could or should do. *State v. Casey*, 263 Minn. 47, 55, 115 N.W.2d 749, 755 (1962) (trial court correctly excluded evidence of a replacement tunnel for a gravel conveyor where no evidence that construction would be physically possible or would be approved by the state highway authority). *See Pahl*, 254 Minn. at 357, 95 N.W.2d at 91 (owner need not apply for a zoning variance where no evidence of prospect for obtaining variance); *Town of Cape Charles v. Ballard Brothers Fish Co.*, 200 Va. 667, 673, 107 S.E.2d 436, 440 (1959) (error to permit consideration of a salvage effort of doubtful and speculative nature).

Here, as was observed before, the state offered to present nothing but conjecture. It wished to show the location of a frontage road, but it made no offer to show that it was feasible to construct a suitable access or that a feasible plan for access would be approved by interested governmental agencies. The state offered the opinion of an appraiser on respondent's damage, but did not suggest that the appraiser would address the question as to the feasibility of access construction. The state hoped to invite the jury to speculate on the construction of access, and the trial court properly refused the request.

## 5. THE SUGGESTION OF A WINDFALL

The state's arguments imply that the application of law by the trial court gives respondent a windfall. The state argues that respondent will at some time enjoy suitable access to its property. The very existence of any windfall is founded on speculation regarding prospective use of respondent's property and the kind of access that might be constructed to it. The suggestion of a windfall is no different than the argument for the introduction of access evidence; based on the record, including the state's offer of proof, the very suggestion of a windfall is nothing other than conjecture.

Although the state does not pose the argument, it can also be imagined that respondent gets something for nothing if it can enjoy the judgment it has been granted but still proceed against the state for specific performance of the state's obligations to construct access or permit construction of access. There is no prospect for that kind of extra benefit for respondent. The trial court has adjudicated the compensation for respondent on the basis of a determination of record that respondent has been denied access to the remainder of its property. Thus, respondent is precluded from asserting obligations of the state under Minn.Stat. §§ 160.08 and 160.18.

## 6. TRIAL COURT DISCRETION

We are under an obligation to defer to the trial court in assessing whether an offer of proof is adequate to show the certainty of access or the reasonableness of steps by a landowner to mitigate its damages. *See Casey*, 263 Minn. at 55, 115 N.W.2d at 755 (the extent of a mitigation duty depends on the facts of each case, and the question of admissibility of evidence is a matter within the discretion of the trial court).

In addition, we are reviewing the trial court's denial of a motion for new trial. That motion should be granted "cautiously and sparingly and only in the furtherance of substantial justice." *Leuba v. Bailey*, 251 Minn. 193, 207–08, 88 N.W.2d 73, 83 (1957). Furthermore, the trial court has broad discretion in deciding whether a new trial is required, and its decision will not be reversed unless there was a clear abuse of discretion. *Connolly v. Nicollet Hotel*, 258 Minn. 405, 407, 104 N.W.2d 721, 724 (1960).

## 7. CONCLUSION

Respondent's remaining land has limited usability and depends upon access construction over a deep and wide ravine lying between usable property and a nearby dead-end road. The state has offered no evidence that access could be constructed in a suitable fashion, or that a design for suitable access would meet the approval of state highway authorities or other interested bodies of government. It was within

the discretion of the trial court to decide that evidence about the frontage road and evidence of an appraisal based on the existence of access called for conjecture and speculation and could not be received.

LOMMEN, Judge, dissenting.

I would affirm the trial court and I join in the dissenting opinion of Judge Crippen.

LESLIE, Judge (dissenting).

I also respectfully dissent and concur with the dissent of my brother, Judge Crippen, and the able reasoning he has advanced in support of that dissent. In addition, I voice my concern over an en banc procedure utilized by this court, which in my opinion is flawed because it is contrary to statute, violates the fundamental rights and expectations of the litigants, and invites serious question as to how thoroughly and completely a panel of 15 judges, without each being furnished individual copies of briefs of the parties, and without each participating in the give and take of the oral arguments, can or should be allowed to overrule the judgment of the original panel assigned to hear and review a case. In my opinion that function belongs exclusively to the Supreme Court and not to an expanded panel of this court not contemplated by law. I elaborate and expound more fully as follows:

The enabling act for the court of appeals provides:

Each case should be submitted to a panel of at least three judges. The decision of a majority of judges to which it is submitted shall be the decision of the court.

Minn.Stat. § 480A.08, subd. 1 (1986). This case was submitted to a panel of three judges. These judges reached a unanimous conclusion to affirm the trial court.

There is no evidence in chapter 480A or in its legislative history that proponents of the court of appeals envisioned a two-level intermediate appellate system, a procedure providing that a panel decision would be the subject of debate and voting by some or all of the other members of the court. To the contrary, it is evident in the language of the statute that panels of the court were to act autonomously.

In addition, I note that the procedure employed in this case involves an action by all of the judges of the court to withdraw submission of a case from one panel and submit the case to an enlarged panel. The judges of the court do not have and should not have the authority to decide whether or not a case should be submitted to a particular panel. Only the Chief Judge of the Court of Appeals, who is empowered by statute to exercise general administrative authority over the court, is empowered to determine the manner of submission of cases to panels. See Minn.Stat. § 480A.03, subd. 2 (1986) (administrative authority vested in Chief Judge, subject to the authority of the Chief Justice of the Minnesota Supreme Court).

Finally, it is legally significant that the judges of this court have taken upon themselves the reconsideration and decision in the case without providing for reargument by counsel. The appellate rules provide:

Except in exigent circumstances, the oral arguments should be heard in the Court of Appeals before the full panel to which the case has been assigned.

Minn.R.Civ.App.P. 134.08. This case was argued before the panel to which the matter was duly submitted. All of the members of that panel studied briefs in the case furnished by counsel. The rights of litigants are put at risk by a procedure whereby a decision of the court is determined through debate and voting on a trial court action which has not been fully argued to all of the participating judges.

What explains the occurrence of the procedure employed in this case? In 1983, before the initial membership of this court was fully constituted, the first appointees to the court adopted an internal rule providing for resubmission of cases by the court sitting en banc. Minn.Ct.App.Internal R. 4.5 (1983). It is evident to me that this rule is in conflict with the enabling act for the court, and that we are prohibited as a matter of law from following the procedure permitted by the rule.

Much has been said and written on the need and the peril in attempting an en banc

procedure for decisions of a state's intermediate appellate court. On the one hand, it is desirable to avoid inconsistent decision-making of the intermediate court; a lawyer's prediction of an appellate decision should not depend upon the makeup of the appellate panel. Nevertheless, it is equally evident that an en banc procedure may adversely affect the rights of litigants, usurp the proper appellate role of the supreme court, and become "ineffective," "wasteful" and "counter-productive" for a court with a large number of judges. *See* P. Carrington, D. Meador, and M. Rosenberg, *Justice On Appeal*, 162 (1976). Certainly, for a court such as ours, sorely overloaded, large and growing larger, we ought not endanger the integrity of a usual and customary review procedure with an exhausting and potentially divisive process of internal debate and reconsideration of our own decisions. These observations concern policy matters to be decided by the legislature, and I submit the legislature has spoken quite unequivocally on the issue. It is evident to me that that wise decision for autonomous work of panels is fully supported by policy considerations on the subject.

In summary, I believe the process employed in the review of this case is a matter of great importance, not only to the people of this state generally, but also to the bench and bar in particular. As the law presently stands, respondents are entitled to contend that the decision of the trial court, affirmed by the panel to which this case was initially submitted for review, represents the law of the case.

POPOVICH, Chief Judge (dissenting).

I would respectfully affirm the trial court. I concur in the dissents of Judge Crippen and Judge Leslie.

RANDALL, Judge (dissenting).

I join in the dissents of Judge Leslie and Judge Crippen.